UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| August Cassano, | ) | Case No. 1:03 CV 1206 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| -vs- | ) | |
| | ) | |
| Margaret Bradshaw, Warden, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |

## INTRODUCTION

Petitioner August Cassano was convicted and sentenced to death in an Ohio state court for the aggravated murder of fellow inmate Walter Hardy. Cassano has now filed a petition and amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentence. (Docs. 26, 138.) Respondent Warden Margaret Bradshaw has filed a return of writ to the amended petition. (Doc. 141.) And Cassano has filed a traverse. (Doc. 144.) For the reasons below, the Court denies Cassano's amended petition.

## FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Cassano's convictions:

> {¶ 1} On October 17, 1997, inmate Walter Hardy moved into a cell at Mansfield Correctional Institution ("MANCI") and became the cellmate of appellant August A. Cassano. Despite complaints by Cassano, authorities did not remove Hardy from the cell. On October 21, 1997, at about 2:30 a.m., Cassano killed Hardy by stabbing him approximately seventy-five times with a shank (prison-made knife). A jury convicted Cassano of aggravated murder. Cassano was sentenced to death.

### Prior Events

> {¶ 2} Cassano was serving time at MANCI because he had been convicted of aggravated murder in Summit County on May 25, 1976.

> {¶ 3} On January 31, 1992, five years before he killed Hardy, Cassano stabbed inmate Troy Angelo inside Angelo's locked prison cell. Cassano had tied a shank to his hand with a shoestring and had stabbed Angelo approximately thirty-two times in the face, neck, chest, back, arms, head, and hand. Angelo escaped when a correctional officer opened the cell door. As Cassano was being led away, he looked at Angelo and said, "I hope you die." On November 6, 1992, Cassano was convicted of felonious assault for stabbing Angelo.

> {¶ 4} Inmate Gerald Duggan testified that when Cassano became his cellmate in 1996, Cassano had told him that "if [Duggan] ever snitched on him he'd kill [him]." Duggan also said that Cassano "liked a lot of time in the cell by himself" and that Duggan had requested a night job to accommodate Cassano. Cassano had told Duggan that he didn't fight anymore, he stabbed. On September 18, 1997, Cassano reminded Juanita Murphy, a case manager, that he "had stabbed an inmate in 1992 and that that was why he had been sent to Lucasville."

### The Killing

> {¶ 5} On the morning of October 17, 1997, Cassano sent a written message to Unit Manager Ted Harris, noting that he did not have a cellmate and that he wanted Alfred Gibson to be his cellmate. Harris denied this request. Cassano had not received Harris's written reply when he stabbed Hardy.

{¶ 6} On the afternoon of October 17, Hardy moved into Cassano's cell. Hardy and others had been in the segregation unit for two days under suspicion of possessing a shank, but Hardy had been exonerated. Inmates described Hardy as weak, even though he became paranoid when he used drugs.

{¶ 7} According to Ollie King, a MANCI sergeant/counselor, Cassano was very upset about having Hardy as his cellmate. On October 17, Cassano told King that "he didn't want that snitching ass faggot in his cell and that we better check [Cassano's] record." King told him to send a message to Ted Harris, the unit manager. Cassano's friend, inmate Michael Cruz, agreed that Cassano was "very angry" about having Hardy as his cellmate. He also stated that Cassano had told authorities, "You just can't put any type of motherfucker in my cell, * * * check my record."

{¶ 8} After Hardy moved in, Cruz remarked to Cassano that he had a new cellmate. Cassano replied, "Not for long." That same day, Cassano told Duggan that when Cassano had been in Lucasville, prison authorities would not assign him a cellmate unless it was absolutely necessary.

{¶ 9} Cassano became very upset when Hardy broke a TV cable outlet. On October 18, Cassano told inmate James Pharner that Hardy "was driving him nuts, that [if] Harris didn't move [Hardy] out [of] the cell, that he would * * * remove him himself."

{¶ 10} On October 21, 1997, at 2:25 a.m., Donald Oats, a MANCI correctional officer, noted that all was quiet. He recalled that the two inmates in Cassano's cell had been in their bunks doing nothing unusual. Around 2:35 a.m., upon hearing a commotion, Oats hurried to Cassano's cell. He saw two inmates fighting and ordered them to stop. He also signaled a "man down" alarm and went to call for help. Oats heard Hardy yelling, "[Cassano] has a knife and he's * * * trying to kill me." When Oats looked into the cell, Cassano was standing over Hardy and stabbing him with a shank.

{¶ 11} Oats yelled and banged on the cell door and ordered Cassano to stop. Twice, Cassano looked at the light Oats shined on him and then "went right back to sticking inmate Hardy." Cassano continued to stab Hardy "hot and heavy, except for the two times that he looked at [Oats] for a second or two." Cassano never said anything, but Hardy was "pleading for help." Cruz heard Hardy screaming, "[L]let [sic] me out, * * * he's killing me, he's stabbing me."

{¶ 12} Corrections officers James Miller and Dwight Ackerman responded to the "man down" alarm within a minute. Ackerman looked into the cell, saw Cassano bent over "assaulting the other inmate," and ordered him to stop. Cassano stood up, and Ackerman saw that Cassano had a shank in his right

hand. Cassano then continued stabbing Hardy. Miller ordered Cassano to stop, but Cassano "didn't look at [Miller.] He looked down and plunged a weapon into inmate Hardy."

{¶ 13} Although unarmed, Oats opened the cell door and ordered Cassano to the back of the cell. Cassano obeyed that order; he continued to hold the shank, which was tied to his right hand by a laundry-bag string. Cassano "was trying to untie it" but apparently had difficulty because his hand was covered with blood. Cassano wore a glove on his right hand.

{¶ 14} When Miller pulled Hardy out of the cell, Hardy told him, "I am not going to make it." Within three to five minutes of the alarm, MANCI nurses arrived and began to treat Hardy. Then Hardy was taken to a hospital, where he was pronounced dead at 3:37 a.m.

{¶ 15} Dr. Keith Norton, a pathologist, concluded that Hardy bled to death and that his collapsed lungs contributed to his death. Dr. Norton found approximately seventy-five knife wounds, including eight wounds to the head, nine to the neck, twenty-four to the back, fifteen to the chest, and various other wounds to the abdomen, hips, legs, arms, and hands. Any one of ten specific wounds could have caused Hardy's death, including several to the lungs and one that pierced the heart. Dr. Norton also found abrasions and scratches on Hardy's body. A toxicologist found cocaine residue in Hardy's urine but not the blood, which indicated use within the last twenty-four to forty-eight hours.

{¶ 16} In Cassano's cell, investigators found many bloodstains, including some on the top bunk sheets where Hardy slept. They also found a bloody right-hand glove on the floor and the unsoiled left-hand mate of that glove in a closed desk drawer that belonged to Cassano.

{¶ 17} Throughout that morning, Cassano made various unsolicited comments. As Cassano walked by Hardy after the attack, he asked, "Is he dead?" While in the TV room, Cassano told Miller, "[t]hey're going to have to check [Hardy] for internal injuries." At the clinic, Cassano asked if Captain Ben Rachel remembered him as "the one that had stabbed a guy thirty times" several years before.

{¶ 18} At 3:50 a.m., Wanda Haught, a nurse, examined Cassano at the MANCI clinic and found no injuries except red marks caused by handcuffs. Cassano stated that he was not injured but that his shoulder was tired. At 5:15 a.m., Haught noticed a superficial scratch on Cassano's left side that had not been present at 3:50 a.m.

{¶ 19} Cassano's pants, T-shirt, and tennis shoes had blood on them. Cassano

asked investigators prior to his giving a blood sample, "What do you need my blood for, that's all his blood?" Cassano's blood tested negative for drugs and alcohol.

## Events After The Killing

{¶ 20} In the spring of 1998, Cassano talked to inmate Pharner about Hardy's death. Cassano said that he had acted in self-defense but blacked out after stabbing Hardy eight times. Cassano stated that "Hardy was smoking crack and * * * jumping up and down on the bunk and it drove [Cassano] nuts and he just went off on him." Cassano said that he had received the shank from an inmate named Carpenter.

{¶ 21} In April 1998, Cassano asked Duggan "to testify that [Duggan] had seen Hardy with the knife that was used to kill him so that [Cassano] could plead self-defense." Duggan had never seen Hardy with a shank.

{¶ 22} At his trial, Cassano testified that he has been in prison since 1976 and that he preferred being quiet and alone in his cell. Cassano had no particular problems with Hardy as his cellmate, except when Hardy was irritable and paranoid because of drug use.

{¶ 23} According to Cassano, he and Hardy watched TV and showed each other family photographs on the evening before Hardy was killed. Hardy had smoked crack cocaine that evening. Around 2:30 a.m., when Hardy briefly got up, he showed Cassano a knife and asked him what he thought about it. In response, Cassano "snatched it out of his hand" and told him the knife was "going out the window." Cassano stated that Hardy then grabbed him by the left shoulder, hit him in the face, and kneed him in the groin.

{¶ 24} Cassano stated that Hardy retrieved the knife and said, "This is for you." Cassano reclaimed the knife from Hardy, stabbed him once, and told him to settle down. However, according to Cassano, Hardy kept coming at him, and Cassano "stabbed him approximately four times." Cassano testified that he believed that he was in danger as long as Hardy kept attacking him. Hardy also tried to hit Cassano with a chair. According to Cassano, "after the last time that [Hardy] attacked * * *, [Cassano] totally * * * lost it." Cassano said that when the guard opened the cell door, he dropped the knife. Cassano denied that the knife had been tied to his wrist, that he had worn a glove on his right hand, that he had "sneak-attacked" Hardy, or that he had planned to kill Hardy. Cassano denied that he had continued to stab Hardy when the corrections officers arrived outside the cell. Cassano also denied that he had made some of the statements that other inmates or prison officials had attributed to him related to Hardy.

{¶ 25} During cross-examination, Cassano stated that while in prison, he had been in over one hundred fights and that he had stabbed four people. Cassano admitted writing various letters to his family, including one letter stating that he would never "have to worry about having a cellmate ever again."

{¶ 26} Inmate Charles Pool testified for the defense and claimed that he sold the murder weapon to Hardy and another inmate in May or June 1997. Inmate Howard Watson testified that Hardy once held an ice pick to his throat and threatened him when Hardy discovered Watson in his cell.

{¶ 27} Mary Hardy, the victim's mother, testified that she had sent her son $7,100 in money orders during his four years in prison and that they had talked on the phone every day. She stated that Hardy was up for parole in November 1997 and had been trying to behave himself. Sally Glover, the unit manager at MANCI, had moved Hardy into Cassano's unit for safety reasons. In his year at MANCI, Hardy had made sixteen cell moves and a total of forty-nine in the previous four years.

{¶ 28} In rebuttal, the state presented testimony from two MANCI officials, Juanita Murphy and Joseph Henderson. Murphy claimed that Cassano asserted that he had "blacked out" but had killed Hardy in self-defense. According to Murphy, Cassano also claimed that Hardy died because nurses had failed to cover the puncture wounds in his lungs. Henderson, the food service manager at MANCI, had tried, at Hardy's urging, to get Hardy moved out of Cassano's cell.

*State v. Cassano*, 96 Ohio St. 3d 94, 94-98 (Ohio 2002).

## PROCEDURAL BACKGROUND

### A.      State-Court Proceedings

### 1.      Trial Court

In March 1998, the Richland County Grand Jury indicted Cassano for the aggravated murder of Walter Hardy under Ohio Rev. Code § 2903.01. The aggravated-murder count carried two death specifications: one pursuant to Ohio Rev. Code § 2929.04(A)(4) (defendant was a prisoner) and the other pursuant to Ohio Rev. Code § 2929.04(A)(6) (prior aggravated murder conviction). (Doc. 134-1 at 70.) Cassano,

represented by Robert Whitney and Bernard Davis, entered pleas of not guilty to all charges. (Doc. 134-1 at 76.)

On May 14, 1998, Cassano filed two *pro se* motions with the trial court regarding his representation. He filed a "Waiver of Counsel," stating that he "would rather control the organization and content of his defense . . . ." (Doc. 134-1 at 92.) And he filed a "Motion for Appointment of Substitute Counsel," requesting "an order dismissing Attorney Bob Whitney and Bernard Davis, and . . . appointment of Mr. Kort Gatterdam . . . ." (Doc. *Id*. at 93-98.) On May 20, 1998, Attorneys Whitney and Davis moved to withdraw as Cassano's counsel because of "a lack of trust and cooperation" between them and their client. (*Id*. at 99.) Later that month, the trial court granted Attorney Whitney and Davis's motion to withdraw, and appointed David Bodiker of the Ohio Public Defender's Office and Douglas Sexton to represent Cassano. (Doc. 134-2 at 1, 3, 4.) On June 5, 1998, the Ohio Public Defender's Office filed an appearance designating Kort Gatterdam and Andrew Love as lead defense counsel. (*Id*. at 41.)

On September 25, 1998, Cassano filed a *pro se* "Motion for Appointment of Co-Counsel," requesting Attorney Gatterdam to serve "as co-counsel on his behalf." (Doc. 134-3 at 97.) At a pretrial hearing held that day, the trial court denied the motion. (Doc. 135-1 at 3-4.) At a pretrial hearing conducted on April 23, 1999, Cassano asked the court if "there [was] any possibility [he] could represent [him]self?" (Doc. 135-4 at 93.) The court again denied the request. (*Id*. at 93-94.) Cassano did not ask to represent himself again.

Cassano's trial began on April 26, 1999. (*See* Doc. 135-5 at 20.) He was represented by Attorneys Love, Gatterdam, and Sexton. (*See id*. at 2.) On May 13, 1999,

the jury convicted Cassano of the aggravated murder charge and both specifications. (Doc.

134-4 at 358-59.) The mitigation phase of the trial began on May 17, 1999, and concluded

the next day. (*Id*. at 371.) The jury recommended that Cassano be sentenced to death. (*Id*.)

The trial court accepted the jury's recommendation and imposed a death sentence. (*Id*.)

## 2. Direct Appeal

On July 8, 1999, Cassano, represented by new counsel David Doughten and John

Parker, timely appealed his convictions and sentence to the Ohio Supreme Court. (Doc.

134-6 at 4.) In his appellate brief, he raised fourteen propositions of law, stated as follows:

1. A criminal defendant enjoys a right to self-representation as guaranteed by the Sixth Amendment of the United States Constitution.

2. In a capital trial, other acts evidence should be proscribed where the admission of such evidence would cause unfair prejudice not only in the guilt-innocence phase, but also where the prejudice would carry over to the penalty phase.

3. The trial court abuses its discretion by having a defendant shackled throughout the trial and by failing to make findings or conduct an evidentiary hearing concerning the necessity of having the appellant shackled throughout the trial.

4. The trial court's refusal to dismiss biased jurors from the panel deprives the defendant of his protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

5. A trial court may not deny a defendant his right to a public trial as guaranteed by the Sixth Amendment of the United States Constitution and Sections 10 and 16, Article I, Ohio Constitution.

6. The trial court's denial of the appellant's right to be present at the jury view violated [Ohio Rev. Code §] 2945.16 and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

7. An inmates [*sic*] cell is his home for the purposes of the affirmative defense of self-defense. Therefore, a defendant has no duty to retreat from the threat of imminent deadly force when attached in his cell.

8

8.   Evidence of a near instantaneous decision to purposely kill another is insufficient to sustain a conviction of prior calculation and design.

9.   Erroneous penalty phase instructions regarding the jury's deliberation process and their rile in the ultimate sentence is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

10.  A prosecutor may not diminish the severity of a life option by arguing that the law or policy may change which would allow the defendant to be released at an earlier date than would presently be permitted.

11.  A sentence of death is inappropriate where the aggravating factors proven at trial do not outweigh the mitigation beyond a reasonable doubt.

12.  The failure of trial counsel to ensure the trial remains public and object to erroneous jury instructions constitutes ineffective assistance of counsel.

13.  The prosecutor may not dismiss jurors merely because of that juror's hesitation to invoke the death penalty.

14.  The death penalty is unconstitutional as presently administered in Ohio.

(Doc. 134-6 at 29-38.)  The State filed a responsive brief.  (Docs. 134-9 – 134-12.)

Cassano filed three *pro se* pleadings in the Ohio Supreme Court requesting to withdraw his appeal.  (Doc. 134-6 at 1-2, 26; Doc. 134-8 at 16-17; Doc. 134-13 at 25.)  The State and Cassano's counsel filed briefs on the matter.  (Doc. 134-8 at 18-43.)  The court denied the motions on July 12, 2000.  (Doc. 134-13 at 26.)

The Ohio Supreme Court affirmed Cassano's convictions and sentence on August 7, 2002.  *Cassano*, 96 Ohio St. 3d at 98.  Cassano moved for a rehearing (Doc. 134-14 at 44), which the court denied on September 25, 2002 (*id*. at 77).

Cassano filed a timely petition for writ of certiorari in the United States Supreme

Court.  (*Id*. at 104.)  The Court denied the petition on March 3, 2003.  (*Id*. at 105.)

### 3.     Post-Conviction Proceedings

While Cassano's direct appeal was pending, the trial court, in a journal entry dated July 19, 1999, noted that Cassano had "indicated" he intended to pursue post-conviction relief, and it therefore appointed counsel to represent him, George Ford, III.  (Doc. 134-5 at 7.)  On August 26, 1999, Cassano filed a *pro se* "Motion for Appointment of Substitute Counsel," arguing that Attorney Ford was ineffective and requesting Adele Shank of the Ohio Public Defender's Office to represent him.  (*Id*. at 8-11.)  The court denied the motion on September 8, 1999.  (*Id*. at 12.)  Attorney Ford moved to withdraw from the case on September 22, 1999.  (*Id*. at 15-18.)  He submitted to the court a letter from Cassano to him stating that he was "fired" and that Cassano would proceed *pro se* or waive the proceedings altogether.  (*Id*. at 17-18.)  Attorney Ford suggested that the court conduct a hearing to determine whether Cassano was knowingly, intelligently, and voluntarily rejecting court-appointed counsel.  (*Id*. at 15.)  The court granted Attorney Ford's motion and appointed John Juhasz, Jr., as new counsel.  (*Id*. at 21.)

On December 9, 1999, Cassano filed in the state trial court a *pro se* motion to waive post-conviction relief.  (*Id*. at 36.)  The court granted the motion.  (*Id*. at 43-44.)

On January 17, 2001, Cassano filed a *pro se* "Motion to Reinstate Post Conviction." (*Id*. at 46.)  On February 26, 2004, Cassano, through new counsel Jeffry Kelleher and Kirk Migdal, filed a "Motion to Vacate Order of Feb. 14, 2000 and Reinstate Petition for Post-Conviction Relief under R.C. 2953.21."  (*Id*. at 75-136.)

On June 9, 2004, Cassano, through counsel, filed a motion for funds to retain an

investigator, mitigation specialist, and psychologist for assistance in the post-conviction proceedings and a motion for leave to conduct discovery. (*Id*. at 144-49, 152-65.) The State opposed both motions. (*Id*. at 166-99.) Cassano's counsel also wrote a letter to the trial-court judge requesting, among other things, records from Mansfield Correctional Institution ("ManCI") that the prosecutor may have submitted to him relating to trial security matters, and records relating to the judge's involvement with ManCI. (*Id*. at 200-02.) The trial court denied Cassano's request for funds for trial specialists. (*Id*. at 204.) In the same judgment entry, the court responded to Cassano's counsel's letter, denying it possessed any records relating to Cassano and his trial, but ordering the prosecutor, ManCI, the Ohio Public Defender's Office, the Ohio State Patrol, and the Ohio Department of Rehabilitation and Corrections to produce responsive documents regarding Cassano and security threats at his trial. (*Id*. at 203-06.) Cassano then filed a supplemental motion for leave to conduct discovery, which the State opposed. (*Id*. at 207-12.) The trial court denied Cassano's motion for discovery. (*Id*. at 213.)

On February 28, 2007, Cassano, through counsel, filed a notice in the trial court that he wished to withdraw his prior motion to withdraw his appeals and asked the court to rule on his motion to reinstate his post-conviction proceedings. (*Id.* at 215-20.) The State filed a brief in opposition. (*Id*. at 221-28.) On March 26, 2007, the trial court denied Cassano's request to reinstate his post-conviction petition. (*Id*. at 229-30.)

Cassano appealed the trial court's judgment denying his motion to reinstate his post-conviction proceedings. (Doc. 134-17 at 4-8.) In his appellate brief, he raised the following assignments of error:

1. The trial court erred when it denied Appellant's motion to reinstate his petition for post-conviction relief because a hearing was never held to determine whether Appellant's waiver of his right to post[-]conviction proceeding[s] was knowingly and intelligently made.

2. The trial court misapplied R.C. § 2953.21 in its denial of Appellant's motion to reinstate his post[-]conviction petition.

(*Id*. at 36, 42 (capitalization altered).)  The State responded.  (*Id*. at 57-101.)

On March 6, 2008, the state appellate court granted both assignments of error, vacated the trial court's judgment, and remanded the matter to the trial court.  (*Id*. at 119-28.)  On July 9, 2008, the trial court issued a judgment entry stating that Cassano no longer wished to waive his right to post-conviction relief, rendering a competency determination unnecessary, and permitting Cassano to file a post-conviction petition.  (Doc. 134-5 at 237-38.)

On May 6, 2009, Cassano, still represented by Attorneys Kelleher and Migdal, filed a petition for post-conviction relief with the trial court.  (Doc. 134-18 at 39-83.)  He asserted two claims, stating:

1. Over objection, Mr. Cassano was compelled to wear both shackles and a stun belt during both the guilt-innocence and penalty phases of his trial.  Everyone in the court, including the entire jury, saw and was fully aware of the shackles throughout both phases of trial.  This violated Mr. Cassano's rights under the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States.

2. Mr. Cassano was denied his right to self-representation as guaranteed by the Sixth Amendment of the United States Constitution.

(*Id*. at 49, 59.)  The State opposed the petition.  (*Id*. at 90-117; Doc. 134-19 at 1-23.)

On June 3, 2009, Cassano filed a *pro se* motion for new counsel.  (Doc. 134-18 at 84.)  The court denied the motion.  (*Id*. at 88-89.)  On July 1, 2009, Cassano, again acting

*pro se*, filed an "Emergency Motion To asign [*sic*] New Postconviction counsel." (Doc.

134-19 at 24.)  This time, the court appointed new counsel for Cassano, Michael Benza.

(*Id*. at 32.)

Cassano, through his new counsel, filed a motion for funds to employ investigators,

which the State opposed.  (*Id*. at 33-70.)  The court denied the motion.  (Doc. 134-20 at 36-

41.)  Cassano then moved for funds to employ an independent psychologist or psychiatrist,

which the State also opposed.  (*Id*. at 42-50; Doc. 134-22 at 17-21.)

On April 5, 2011, Cassano, through counsel, filed a motion to recuse the trial-court

judge, Judge James Henson.  (Doc. 134-19 at 74-79; Doc. 134-20 at 1-33.)

On May 3, 2011, Cassano filed a "Petition for Postconviction Relief Pursuant to

O.R.C. § 2953.21," which was treated as an amended, rather than successive, petition for

post-conviction relief.  (Doc. 134-20 at 51-85; Doc. 134-21 at 1-75; Doc. 134-22 at 1-10.)

It raised seven claims for relief, stated as follows:

1. Cassano was denied a fair trial before a fair and impartial judge.

2. Cassano's conviction and sentence are void as he was deprived of the effective assistance of counsel.

3. Prosecutorial misconduct permeated Cassano's trial and deprived him of a fair trial.

4. During the course of the trial the jurors engaged in at least two instances of improper conduct.

5. Ohio's capital punishment scheme fails to comply with Eighth Amendment mandates to protect against arbitrary and capricious death sentences.

6. Post-conviction is a fraud.

7. The trial court denied Cassano his constitutional right to self-

representation.

(Doc. 134-20 at 54, 59, 65, 70, 72, 79, 81 (capitalization altered).)

Also on May 3, 2011, the State opposed Cassano's motion to recuse Judge Henson. (Doc. 134-22 at 17-21.) On August 9, 2011, Cassano, through counsel, filed an application for disqualification of Judge Henson in the Ohio Supreme Court. (*Id*. at 56-58.) On August 31, 2011, the Ohio Supreme Court issued an order stating that Judge Henson had decided to step aside from further proceedings in Cassano's case and dismissed the affidavit of disqualification as moot. (*Id*. at 70.)

Cassano then filed motions to stay and abey pending a competency evaluation, for funds to employ an independent psychologist or psychiatrist, and for funds to employ investigators. (Doc. 134-23 at 1-32, 70.)[1] The State opposed each of these motions. (*Id*. at 35-52.)

On June 18, 2012, the trial court dismissed Cassano's post-conviction petition and denied his motions to stay and abey and motions for funds to employ experts and investigators. (*Id*. at 70-80.)

Cassano, still represented by Attorney Benza, timely appealed the trial court's judgment to the court of appeals. (*Id*. at 81.) In his appellate brief, he raised the following assignments of error, stated as:

1.      The trial court erred by dismissing Appellant's post-conviction petition, where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

_____

[1] The motion to stay and abey and motion for funds for a psychologist or psychiatrist are not included in Respondent's appendix to the return of writ.

2.    The trial court erred in not providing resources to Cassano to determining [*sic*] Cassano's competency, failing to evaluat[e] Cassano's competency, and to render an opinion as to Cassano's competency to proceed in post-conviction.

3.    The trial court erred in dismissing Cassano's claim that Judge Henson deprived Cassano of his right to a fair trial due to his bias and prejudice.

4.    The trial court erred in denying relief on the basis of ineffective assistance of counsel.

5.    The trial court erred in denying relief on the basis of prosecutorial misconduct.

6.    The trial court erred in denying relief on the basis of juror misconduct.

7.    The trial court erred in denying relief, or even reviewing the merits of Cassano's challenge to the ongoing Eighth Amendment viability of Ohio's death penalty scheme.

8.    The trial court erred in denying relief on the denial of Cassano's right of self-representation.

(Doc. 134-24 at 36-37 (capitalization altered).) The State filed a responsive brief. (Doc. 134-25 at 1-37.)

The appellate court affirmed the trial court's judgment on April 11, 2013. (*Id.* at 60-81.)

Cassano filed a timely appeal of the court of appeals' decision with the Ohio Supreme Court. (Doc. 134-26 at 2-24.) In his memorandum in support of jurisdiction, he raised eight propositions of law, stated as:

1.    In an action for post-conviction relief, a petition that presentes sufficient operative facts supported by evidence *de hors* the record meets the required pleading standard and must not be summarily dismissed without discovery and an evidentiary hearing.

2.    A capital post-conviction petitioner is entitled to be competent while pursing [*sic*] post-conviction relief.

15

3.    When a petitioner submits evidence demonstrating that the trial judge was meeting with, and discussing, the case before and during the trial with witnesses and the state[,] the post-conviction court must permit discovery and hold a hearing, and ultimately grant relief.

4.    When a petitioner submits evidence demonstrating deficient performance of counsel the post-conviction court must permit factual development and hold an evidentiary hearing and cannot simply assume that decisions were strategic decision[s].

5.    A trial court facing evidence of juror misconduct conduct [*sic*] a *Remmer* hearing in post-conviction proceedings where no such hearing was held at the trial?

6.    A post-conviction court facing evidence of juror misconduct conduct [*sic*] must conduct a *Remmer* hearing where no such hearing was held at the trial.

7.    A post-conviction court, facing evidence of systemic failures of Ohio's death penalty scheme[,] must conduct an independent inquiry including evidence *de hors* the record.

8.    A post-conviction court, facing evidence that an earlier judicial decision was predicated on a clearly incorrect factual assertion[,] must review the claim on the merits of the new evidence.

(*Id*. at 26-27 (capitalization altered).)  The State opposed the memorandum.  (*Id*. at 99-141.)

On July 22, 2013, Cassano filed a *pro se* "Emergency Motion to Remove Michael J. Benza."  (*Id*. at 142-43 (capitalization altered).)

On June 24, 2015, the court declined to accept jurisdiction of the appeal.  (*Id*. at 145.)  Five days later, it denied Cassano's motion to remove his counsel as moot.  (*Id*. at 144.)

### 4.    Application to Reopen Direct Appeal

Meanwhile, on February 27, 2004, Attorneys Benza and Kelleher filed on Cassano's behalf in the Ohio Supreme Court a motion for appointment of counsel to apply to reopen

16

Cassano's direct appeal. (Doc. 134-15 at 16-20.) The Ohio Supreme Court's practice rules permit capital defendants to request to reopen their direct appeal to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause." *See* Ohio S. Ct. Prac. R. 11.06(A) (this rule was designated as Ohio S. Ct. Prac. R. XI, § 5 when Cassano filed his application); *see also State v. Murnahan,* 63 Ohio St. 3d 60 (Ohio 1992). The court granted the motion on March 15, 2004, and remanded the matter to the trial court for appointment of counsel. (Doc. 134-15 at 21.) The trial court appointed Attorneys Benza and Kelleher to represent Cassano in the reopening proceedings. (*Id.* at 36-37.)

Cassano filed his reopening application in the Ohio Supreme Court on July 21, 2004. (*Id.* at 40-82.) In his application, he asserted that he was denied the effective assistance of appellate counsel for failing to raise on direct appeal the following assignments of error:

1. The prosecutors' misconduct tainted the entire proceedings and deprived Mr. Cassano of a fair and impartial trial.

    A. Used peremptory challenges to exclude women from jury.

    B. Improper bolstering of witnesses.

    C. Intentionally violated Mr. Cassano's Fifth Amendment rights.

    D. Withheld exculpatory, impeachment, or mitigation evidence.

    E. Improper *ex parte* contact with jurors.

    F. Improper use of victim impact evidence.

    G. Improper closing argument: trial phase.

    H. Improper closing argument: mitigation phase.

17

2.  The trial court committed numerous errors presiding over Mr. Cassano's trial.

    A.  Failed to recuse itself from the case after reviewing *ex parte* materials and conducting an independent investigation of various matters.

    B.  Improperly deprived Mr. Cassano of grand jury transcripts.

    C.  Improperly conducted *voir dire*.

    D.  Improperly limited Mr. Cassano's opening statement.

    E.  Improperly prevented the jury from taking notes.

    F.  Improperly weighed both aggravating circumstances cumulatively against the mitigation evidence.

    G.  Improperly considered victim impact evidence.

3.  The jury instructions denied Mr. Cassano a fair trial and due process . . . . [when] the trial court improperly instructed the jury in the following manner:

    A.  that purpose and intent are the same thing.

    B.  that its sentencing decision turned on whether the aggravating circumstances outweighed the mitigating factors. This is a misstatement of law and improperly shifted the burden of proof and persuasion to Mr. Cassano.

    C.  to weigh ***both*** aggravating circumstances against the mitigating factors. This is incorrect as the jury must individually and separately weigh each aggravating circumstance against all the mitigating factors.

    D.  that Mr. Cassano had the burden of proof under the voluntary manslaughter charge.

    E.  that all decisions, including rejecting a charge and the sentencing decision of life, had to be unanimous.

    F.  improperly instructed the jury that it must acquit of aggravated murder before it could consider the lesser included charge of

murder. . . .

    G.    improperly instructed the jury that it must acquit of murder before it could consider the lesser included charge of voluntary manslaughter.

4.    The jury was improperly instructed to consider plural aggravating circumstances.

5.    The jury committed numerous acts of misconduct.

6.    Mr. Cassano was denied the effective assistance of counsel at trial . . . by failing to:

    A.    object to the prosecutors' misconduct identified in Proposition of Law No. 1, *infra*.

    B.    object to the trial court's misconduct and errors identified in Propositions of Law No. 2 and 3, *infra*.

    C.    object to, and in fact contributed to, the improper argument of plural aggravating circumstances identified in Proposition of Law No.4, *infra*.

    D.    conduct a proper voir dire and to challenge biased jurors for cause.

    E.    move for the recusal and disqualification of the trial judge. *See* Proposition of Law No.2.

    F.    prepare Mr. Cassano for trial.

    G.    [A]ttorney Love, one of the two Ru1e 20 certified trial counsel was unavailable to prepare for trial.

    H.    adequately and properly investigate and prepare for the mitigation phase of the case.

    I.    ensure that a complete and accurate record was made of the trial proceedings.

7.    Mr. Cassano was denied the effective assistance of counsel on appeal.

(*Id*. at 40-50 (capitalization altered).)  The State filed a memorandum in opposition.  (Doc.

134-16 at 1-33.)

On October 13, 2004, the Ohio Supreme Court denied the application as untimely.

(*Id*. at 34.)

**B.     Federal Habeas Proceedings**

Cassano filed a notice of intent to initiate this habeas action on June 16, 2003.

(Doc. 1.)  He requested appointment of counsel and leave to proceed *in forma pauperis* that

same day.  (Docs. 6, 8.)  This Court granted both motions and appointed John Parker and

David Doughten to represent him.  (Docs. 10, 11.)  At Cassano's request, the Court

removed Attorneys Parker and Doughten and appointed new counsel, Attorneys Migdal and

Kelleher, in November 2003.  (Doc. 22.)

After requesting and receiving additional time, Cassano filed his petition for writ of

habeas corpus on March 2, 2004.  (Doc. 26.)  On March 5, 2004, Cassano filed a motion to

stay the proceedings and hold them in abeyance pending exhaustion of state-court remedies

and a motion for leave to amend the petition.  (Docs. 28, 29.)  Respondent, Warden

Margaret Bradshaw,[2] opposed both motions.  (Docs. 30, 31.)  The Court denied Cassano's

motions without prejudice.  (Docs. 34, 68.)

Respondent filed a return of writ on April 30, 2004.  (Doc. 63.)  Cassano filed a

traverse on June 15, 2004.  (Doc. 64.)  Respondent replied to the traverse on June 30, 2004.

---

[2] Margaret Bradshaw was warden of the Mansfield Correctional Institution in Mansfield, Ohio, where Cassano was incarcerated at the time he filed his original petition in this matter.  (*See* Doc. 63 at 11.)  Cassano is now imprisoned at the Chillicothe Correctional Institution in Chillicothe, Ohio, of which Tim Shoop is the warden.

(Doc. 67.)

On December 7, 2004, Cassano, through counsel, filed a second motion to stay the federal habeas proceedings pending exhaustion of state-court remedies. (Doc. 73.) Respondent opposed the motion. (Doc. 74.) The Court granted the motion on February 10, 2005. (Doc. 76.)

In 2005 and 2006, Cassano filed numerous *pro se* motions in this Court to obtain substitute counsel and/or withdraw his petition. In June 2005, acting *pro se*, he filed and then promptly withdrew a motion for substitute counsel. (Docs. 77, 78.) He filed two more *pro se* motions for new counsel in September and October 2006 (Docs. 81, 82), which the Court denied (Doc. 83).

In December 2006, after Cassano filed yet another *pro se* motion to withdraw counsel or in the alternative to "withdraw [his] appeals" (Doc. 84), followed shortly by a *pro se* motion to "withdraw any and all appeals" and have his "sentence . . . carried out as soon as possible" (Doc. 85), the Court ordered Cassano's counsel to file a motion requesting that Cassano undergo a competency evaluation to determine whether he was competent to make a *pro se* request to remove counsel and withdraw this action and any future appeals (Doc. 87). Cassano, through counsel, opposed the Court's order after determining that they had no good-faith basis to request a competency evaluation of Cassano but did not object to the Court ordering one. (Doc. 90.) That same day, Cassano filed a letter with the Court withdrawing his previous request to terminate all appeals, and his counsel filed a supplemental pleading stating a competency evaluation was no longer required because Cassano had withdrawn his request to waive his appeals. (Docs. 89, 92.)

21

Respondent responded by requesting the Court conduct a colloquy with Cassano on the record to verify his intention to withdraw his waiver. (Doc. 92.) On March 2, 2007, the Court conducted a video conference with Cassano and counsel for both parties regarding Cassano's *pro se* motions (Doc. 94), after which the Court denied Cassano's motions as moot (Doc. 95).

On September 17, 2007, Cassano filed a *pro se* motion challenging Ohio's "[u]nfair [s]treamline[d] [a]ppeals." (Doc. 97.) The Court, after addressing and rejecting Cassano's concerns, denied the motion. (Doc. 98.)

In March and April 2012, Cassano again filed *pro se* motions to withdraw his appeals and have an execution date set "as soon as possible." (Docs. 106, 108.) Upon the Court's order (Doc. 107), Respondent and Cassano's counsel filed responses to Cassano's filings, stating their positions regarding the need for a competency evaluation (Docs. 109, 110). On April 25, 2012, the Court deferred ruling on the motions until the state trial court had completed its review of Cassano's pending motion in that court to stay his state post-conviction proceedings pending a competency evaluation. (Doc. 113.) On August 10, 2012, Cassano wrote to the Court notifying it that he now wished to continue with his appeals. (Doc. 114.) The Court then denied his motions to withdraw his appeals as moot. (Docs. 115, 116.)

On March 17, 2016, the Court lifted the stay of these proceedings as Cassano's state-court proceedings were complete. (Doc. 121.) On June 24, 2016, Cassano moved to amend his petition and filed the amended petition. (Docs. 122, 123.) Respondent, without waiving any statute-of-limitations defenses to Cassano's claims, did not oppose the motion

to amend.  (*See* Doc. 124.)  The Court granted it.  (Doc. 125.)

On October 20, 2016, the Court granted Attorneys Kelleher and Migdal's oral request to withdraw from representing Cassano and appointed Attorneys John Lewis and Jon Oebker as new counsel.  (Doc. 131.)

On April 3, 2017, Cassano filed a second amended petition.  (Doc. 138.) Respondent filed a return of writ on May 8, 2017.  (Doc. 141.)  And Cassano filed a traverse on June 22, 2017.  (Doc. 144.)

**PETITIONER'S GROUNDS FOR RELIEF**

Cassano asserts fifteen claims for relief.  They are:

1.  Petitioner was denied his right of self-representation under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution when the trial [court] denied his motion to represent himself at trial.

2.  Petitioner was denied his rights to due process of law, a fair trial, to be present at all proceedings and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution when the trial court prevented him from attending the jury view conducted in this case.

3.  Petitioner was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution when the trial court ordered him to wear a stun belt and be shackled during trial.

4.  Petitioner was denied his rights to due process of law, a fair and public trial and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution when the trial court excluded persons from hearings held in this case.

5.  Petitioner was denied his rights to due process of law to a fair trial and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution when evidence of his prior felonious assault, his use of drugs and his alleged sexual proposals to another inmate was admitted.

23

6. Petitioner was denied his [c]onstitutional right to the effective assistance of counsel under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

7. Petitioner was deprived of his rights to equal protection, due process of law and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, when the trial court dismissed his state postconviction proceedings without providing the assistance of requested experts and investigators including mental health experts or having Petitioner's mental health evaluated.

8. Petitioner was deprived of his right to the effective assistance of counsel, equal protection, due process of law and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, by reason of the acts and omissions of his state postconviction counsel.

9. Petitioner received the ineffective assistance of counsel on his direct appeal to the Supreme Court of Ohio and was thereby deprived of his rights to equal protection, due process of law and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

10. Petitioner received the ineffective assistance of counsel on his direct appeal to the Supreme Court of Ohio and was thereby deprived of his rights to equal protection, due process of law and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because his appellate counsel failed to preserve his right to file a timely application to reopen that appeal.

11. Petitioner's death sentence violated the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because Ohio's death penalty scheme is unconstitutional.

12. Petitioner was denied his right to due process of law [under] the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because the trial judge was biased and that bias affected his decisions, orders and actions before trial, during trial and following the conclusion of trial.

13. Petitioner's death sentence is void or voidable because Ohio's death

penalty scheme violates international law and, thereby, Article VI of the Constitution.

14.     Petitioner was denied [d]ue [p]rocess and [e]qual [p]rotection because Ohio's [p]ostconviction procedures did not provide him an adequate corrective process to fully and fairly vindicate his federal constitutional claims in the Ohio courts under principles of comity and [f]ederalism.

15.     The State of Ohio violated the Equal Protection Clause of the Fourteenth Amendment by utilizing peremptory challenges to exclude women from Petitioner's jury.

(Doc. 138 at 15, 22, 24, 26, 28, 29, 35, 38, 41, 44, 47, 52, 56, 59, 64.)

## STANDARDS OF REVIEW

### A.     AEDPA Review

Cassano's petition for writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's effective date). AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)). The Act "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 18 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*. at 19.

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in § 2254(d). That provision forbids a federal court

from granting habeas relief with respect to a "claim that was adjudicated on the merits in

State court proceedings" unless the state-court decision either:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim

at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court

has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of

whether the state court provided little or no reasoning at all for its decision. "When a

federal claim has been presented to a state court and the state court has denied relief, it may

be presumed that the state court adjudicated the claim on the merits in the absence of any

indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562

U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing

legal principle or principles set forth by the Supreme Court at the time the state court

renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the

holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S.

Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). The state-court

decision need not refer to relevant Supreme Court cases or even demonstrate an awareness

of them; it is sufficient that the result and reasoning are consistent with Supreme Court

precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 18; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[3] The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas

---

[3] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington,* 562 U.S. at 102-03 (internal quotation marks omitted). A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does

not by definition preclude relief." *Miller-El*, 537 U.S. at 340. Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'" *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.). Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B.     Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).

It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.

Where a state court declines to address a prisoner's federal claim because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[4]

_____

[4] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. It is:

First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

---

state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, the federal court again looks to the last state court rendering a reasoned opinion on that claim. *Ylst,* 501 U.S. at 805. If the state court "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted.[5] *Harris v. Reed*, 489 U.S. 255, 263 (1989). Conversely, if the last state court presented with the claim reaches its merits, then the procedural bar is removed and the federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 801.

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.*

---

[5] Where a later state-court decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst,* , 501 U.S. at 804 n.3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id.* at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

### C.      Cognizability

To the extent a claim asserted in a federal habeas petition alleges state-law violations, it is not cognizable on federal habeas review and should be dismissed on that basis. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long

recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted). Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

### DISCUSSION

**A.     First Claim for Relief:  *Right to Self-Representation***

In his first claim for relief, Cassano argues the trial court violated his constitutional

right to represent himself. (Doc. 138 at 15-22.) Cassano presented this claim on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits. *Cassano*, 96 Ohio St. 3d at 98-100. The claim, therefore, is preserved for federal habeas review. *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (habeas claim exhausted where petitioner "invok[es] one complete round of the State's established appellate review process"). Respondent contends this claim is meritless. (Doc. 141 at 42-46.)

In rejecting this claim, the Ohio Supreme Court reasoned:

{¶ 31} In proposition of law I, Cassano argues that the trial court erred because it refused his request to represent himself "without making an in depth inquiry into Cassano's competency and ability to waive his right to appointed counsel."

{¶ 32} We have recognized that "a defendant in a state criminal trial has an independent constitutional right of self-representation and * * * may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph one of the syllabus, citing *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. If a trial court denies the right to self-representation, when properly invoked, the denial is per se reversible error. *State v. Reed* (1996), 74 Ohio St.3d 534, 660 N.E.2d 456, citing *McKaskle v. Wiggins* (1984), 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122. To establish an effective waiver of the right to counsel, "the trial court must make sufficient inquiry to determine whether [the] defendant fully understands and intelligently relinquishes that right." *Gibson*, 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph two of the syllabus.

{¶ 33} Following his indictment, Cassano filed several pro se motions, including a waiver of counsel, on May 14, 1998. That same day, he also asked that appointed counsel, Robert Whitney and Bernard Davis, be dismissed and that Kort Gatterdam of the Ohio Public Defender's Office be appointed as counsel. Thereafter, Whitney and Davis withdrew, and the court appointed the State Public Defender as counsel and Douglas Sexton as local counsel.

{¶ 34} On September 25, 1998, Cassano filed a pro se motion requesting "hybrid" legal representation consisting of himself and Gatterdam. At a hearing that day, Cassano asserted, "I have a right to be co-counsel with my attorneys." The court responded, "I can't allow you to represent yourself. * * * I'm willing to look into that further, but at this point we're going to proceed with these

gentlemen."

{¶ 35} Following lengthy hearings on April 23, 1999, Cassano queried, "Is there any possibility I could represent myself? I'd like that to go on record." The trial court replied that it would not be in Cassano's best interest to represent himself.

{¶ 36} In response, the prosecutor stated that Cassano is "essentially asking that the case be continued so that [another of Cassano's attorneys] would have a chance to prepare more." Sexton and Gatterdam stated that they were fully prepared for trial. Sexton and Gatterdam also stated that Andrew Love was lead counsel and that he had not had much time to prepare the case for trial, though he would be present at the start of the trial. The court stated that voir dire would start on Monday, but if "additional time is needed and it can be justified, [the court] can certainly consider that." Cassano proceeded to trial represented by counsel and did not again mention that he wanted to represent himself.

{¶ 37} We reject Cassano's claim that his rights of self-representation were violated. Cassano's initial demand to represent himself focused on hybrid representation. Cassano's only written motion on that point was made in September 1998 and related solely to hybrid representation. Cassano did not mention that he wanted to represent himself alone until April 23, 1999, only three days before the start of the trial. "A defendant has no right to a 'hybrid' form of representation wherein he is represented by counsel, but also acts simultaneously as his own counsel." *State v. Keenan* (1998), 81 Ohio St.3d 133, 138, 689 N.E.2d 929, citing *McKaskle*, 465 U.S. at 183, 104 S.Ct. 944, 79 L.Ed.2d 122.

{¶ 38} Cassano did not unequivocally and explicitly invoke his right to self-representation, even on April 23, 1999. "The constitutional right of self-representation is waived if it is not timely and unequivocally asserted." *Jackson v. Ylst* (C.A.9, 1990), 921 F.2d 882, 888. See, e.g., *Reese v. Nix* (C.A.8, 1991), 942 F.2d 1276, 1281 ("I don't want no counsel then" was not a clear and unequivocal pro se demand requiring *Faretta* inquiry); *United States v. Frazier–El* (C.A.4, 2000), 204 F.3d 553, 558 (assertion of the right of self-representation "must be * * * clear and unequivocal").

{¶ 39} We find that Cassano's April 23, 1999 statement was not an explicit and unequivocal demand for self-representation. Accordingly, the court did not deny his right to self-representation.

{¶ 40} We also find that Cassano's request was untimely because it was made only three days before the trial was to start. See, e.g., *United States v. Mackovich* (C.A.10, 2000), 209 F.3d 1227, 1237 (requests made six to ten days

before trial "were merely a tactic for delay"); *United States v. George* (C.A.9, 1995), 56 F.3d 1078, 1084 (request made on eve of trial untimely); *United States v. Frazier–El*, 204 F.3d at 560 (the "right does not exist * * * to be used as a tactic for delay").

{¶ 41} Cassano was represented for over ten months by the same counsel. In that time, he did not ask that those counsel be discharged so that he could proceed alone and without counsel. Cassano referred to self-representation on April 23 only in the context of supporting his last-minute request for delay. We conclude that Cassano made this remark about representing himself as an attempt to delay the trial.

{¶ 42} Finally, we conclude that Cassano abandoned any intention to represent himself when he did not pursue the issue of self-representation after the court told him it would not be a good idea. See *McKaskle*, 465 U.S. at 182, 104 S.Ct. 944, 79 L.Ed.2d 122 (defendant can waive his right to self-representation by allowing counsel to participate in trial). Accord *Wilson v. Walker* (C.A.2, 2000), 204 F.3d 33, 38 (failure to reassert a desire to proceed pro se constituted a waiver). For the foregoing reasons, we reject proposition of law I.

*Cassano*, 96 Ohio St. 3d at 98-100.

Cassano also raised his self-representation claim in state post-conviction proceedings, presenting new supporting evidence. (Doc. 134-20 at 81-83.) The trial court denied the claim based on Ohio's *res judicata* doctrine, because the issue was raised and fully litigated on direct appeal.[6] (Doc. 134-23 at 80.) The state appellate court affirmed the trial court's judgment, finding Cassano's new evidence did not overcome the *res judicata* bar.[7] It stated:

---

[6] Ohio's *res judicata* rule precludes a defendant from raising for the first time in post-conviction proceedings a claim that was fully litigated or could have been fully litigated at trial or on direct appeal. *State v. Perry*, 10 Ohio St. 2d 175, 180 (Ohio 1967).

[7] An exception to Ohio's *res judicata* doctrine lies where a petitioner presents evidence *dehors*, or outside, the record to support a claim on post-conviction review. *See, e.g., State v. Smith*, 17 Ohio St. 3d 98, 101 n.1 (Ohio 1985). This exception applies where the defendant "had no means of asserting the constitutional claim there asserted until his discovery, after the judgment of conviction, of the factual basis for asserting that claim," so the claim "was not one that could

37

{¶ 76} In his final assignment of error, appellant argues that the court erred in dismissing his claim that he was denied his right to self-representation. Appellant admits that this issue was raised and rejected by the Ohio Supreme Court. However, appellant argues that the Supreme Court found that he raised the issue of self-representation in the trial court for purposes of delay, and he has presented evidence to rebut this conclusion.

{¶ 77} Appellant attached an affidavit of Stacey Lane to his petition. In this affidavit, Lane states that he received a letter from appellant in 1997 or 1998 describing the killing of his cellmate at MANCI and asking for advice. Lane had represented himself after he was indicted for murdering his cellmate in Lebanon Correctional Institution. Lane asserted a defense of self-defense and was acquitted. He stated that he provided appellant with information as to how to defend himself.

{¶ 78} The Ohio Supreme Court found that appellant did not unequivocally and explicitly invoke his right to self-representation, even on April 23, 1999, three days before trial. *Cassano*, supra, at ¶ 38–39. Prior to that time appellant filed a pro se motion in September of 1998 focusing solely on hybrid representation. Further, appellant was represented by the same counsel for over ten months and never requested that counsel be discharged and he be permitted to proceed pro se until three days before trial. *Id*. at ¶ 41. The affidavit submitted by Stacey Lane only demonstrates that appellant had received information about representing himself in 1997 or 1998. The time for appellant to demonstrate that he was serious about representing himself was prior to trial, and the issue was fully litigated in the trial court and in the Ohio Supreme Court. The trial court did not err in denying this claim for relief.

*Cassano*, 2013 WL 1858614, at *10.  The Ohio Supreme Court declined jurisdiction over

Cassano's appeal of that judgment.  (Doc. 134-26 at 145.)

Cassano argues the Ohio Supreme Court's decision on direct review – the last state-

---

have been raised . . . before the judgment of conviction, and hence could not reasonably be said to have been . . . waived." *Perry*, 10 Ohio St. 2d at 179.  However, "[t]he outside evidence must meet a threshold level of cogency."  *State v. Lynch*, 2001 WL 1635760, at *3 (Ohio Ct. App. Dec. 21, 2001).  It "must be 'competent, relevant and material' to the claim, be more than marginally significant, and advance the claim 'beyond mere hypothesis and a desire for further discovery.' . . . [I]t must not be cumulative of or alternative to evidence presented at trial."  *State v. Fears*, 1999 WL 1032592, at *3 (Ohio Ct. App. Nov. 12, 1999) (citations omitted).

court decision addressing the merits of his self-representation claim[8] – misapplied Supreme Court precedent and was based on unreasonable factual determinations. (*See* Doc. 138 at 20.) The Court disagrees.

The Sixth and Fourteenth Amendments guarantee every criminal defendant the right to counsel to assist with his defense. U.S. Const. amends. VI, XIV. But in *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court held that a defendant in a state criminal trial also "has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." *Id.* at 807 (emphasis added). This right to self-representation stems from "a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id.* at 817.

Nevertheless, "the right to self-representation is not absolute." *Martinez v. Ct. of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152, 161 (2000). Because the dangers and

---

[8] Although the state appellate court reviewed this claim in post-conviction proceedings *after* the Ohio Supreme Court adjudicated it on direct appeal, the Court finds the later, appellate court decision rested on the procedural bar of *res judicata* rather than the merits, making the Ohio Supreme Court's decision the proper subject of federal habeas review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). The Court notes that generally, "a state court invoking a state procedural bar must provide a 'clear and express' statement to that effect (the 'plain statement' rule)" for it to preclude AEDPA review. *Gulertekin v. Tinnelman-Cooper,* 340 F.3d 415, 422-23 (6th Cir. 2003). And the post-conviction appellate court here did not expressly state that it was applying Ohio's *res judicata* rule. But the appellate court's analysis made it sufficiently clear that its decision rested on procedural grounds: the court emphasized that Cassano's self-representation claim was "fully litigated" by the Ohio Supreme Court on direct appeal and focused on the extra-record evidence Cassano presented to overcome the *res judicata* bar, finding it insufficient. Moreover, a state court will not be found to have waived a procedural bar under the plain statement rule where the state court's analysis, like here, does not "'fairly appear to rest primarily on federal law or to be interwoven with federal law.'" *Id.* at 423 (quoting *Coleman v. Thompson,* 501 U.S. 722, 735 (1991)).

39

disadvantages of self-representation during trial are so great, there is a "strong presumption against" waiver of the right to counsel. *Patterson v. Illinois*, 487 U.S. 285, 307 (1988). "[I]t is clear that it is representation by counsel that is the standard, not the exception." *Martinez,* 528 U.S. at 161. "Even at the trial level, . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id*. at 162 (holding that *Faretta* does not require that a criminal defendant be allowed to represent himself on direct appeal).

The defendant, therefore, must "'knowingly and intelligently'" elect to conduct his own defense. *Faretta,* 422 U.S. at 835 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938)). Courts must conduct a "searching or formal inquiry" to ensure that a defendant's waiver of the right to counsel is valid. *Patterson*, 487 U.S. at 299. "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1943)). Whether a defendant has made an intelligent waiver of counsel "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst*, 304 U.S. at 464.

The defendant's request to proceed without counsel also must be "clear and unequivocal." *See, e.g., Raulerson v. Wainwright*, 469 U.S. 966, 969-70 (1984) (Marshall, J., dissenting from an order denying certiorari) ("[S]ince a defendant must act affirmatively

to relinquish the right to counsel, it follows that the right of self-representation must affirmatively be asserted as well."); *United States v. Cromer*, 389 F.3d 662, 682 (6th Cir. 2004) ("*Faretta* procedures are only required when a defendant has clearly and unequivocally asserted his right to proceed *pro se* . . . ."). In *Faretta,* the Court observed that the defendant had "clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel." *Faretta*, 422 U.S. at 835.

Finally, the defendant must assert his self-representation right in a timely manner. *See Martinez*, 528 U.S. at 162 ("most courts require [a defendant to request to proceed *pro se*] in a timely manner"). In *Faretta,* the Court emphasized that the defendant had requested to represent himself "[w]ell before the date of trial" and "weeks before trial." *Faretta*, 422 U.S. at 807, 835. If a defendant does not invoke this right in a timely fashion, "it may be deemed forfeited as a threshold matter." *Hill v. Curtin,* 792 F.3d 670, 677 (6th Cir. 2015).

Cassano argues the trial court erred by failing to conduct a "searching or formal" *Faretta* inquiry after he clearly and unequivocally asserted his right to proceed without counsel on three separate occasions (highlighted below in bold). (Doc. 138 at 17-20.) He first asked to represent himself, he claims, on May 14, 1998, when he filed a *pro se* "**Waiver of Counsel**." (*Id*. at 21.) It stated:

> August A. Cassano, pro-se, now respectfully waives counsel in the above[-] captioned case as is his constitutional right.
>
> The substance of Mr. Cassano's position before the law, is that he would rather control the orginization [*sic*] and content of his defense, be able to file motions, argue points of laws, call favorable witnesses, cross-examine any adverse witnesses and be allowed to conduct his defense in a manner considered fundemental [*sic*] to the fair adminastration [*sic*] of American justice.

41

(Doc. 134-1 at 92 (capitalization altered).)  But Cassano also filed that day a *pro se* "Motion for Appointment of Substitute Counsel," complaining about his counsel's representation and asking that Attorney Gatterdam be appointed.  (*Id*. at 93–98.)  Shortly after, Cassano's attorneys moved to withdraw as defense counsel because of "a lack of trust and cooperation" between them and Cassano (*id*. at 99), which the trial court granted (Doc. 134-2 at 3), appointing new counsel (*id*. at 1, 4).  The trial court did not rule on Cassano's "Waiver of Counsel" at that time.  (*See* Doc. 134-1 at 2-7 (trial court docket).)

Cassano claims he next asserted his right to self-representation through an "oral motion" at a pretrial hearing on September 25, 1998.  (Doc. 138 at 16-17, 21.)  That day, Cassano filed a *pro se* "Motion for Appointment of Co-Counsel," requesting that the court "appoint [Attorney Gatterdam] as co-counsel on his behalf."  (Doc. 134-3 at 97.)  He argued in a memorandum in support of the motion that *Faretta* "support[s] the recongnition [*sic*] of Defendant's right to be appointed as co-counsel in his own defense."  (*Id*. at 98.)  At the hearing, the judge stated that he would first address Cassano's *pro se* "motion to appoint co-counsel to represent him while he represents himself."  (Doc. 135-1 at 3.)  The judge announced that he was "going to overrule that motion subject to changing the decision at some later time, provided that the law requires me to allow him to represent himself."  (*Id*.)  He explained:

> The reason being, of course, that the defendant, not being trained in the law, is not capable, in my estimation, to represent himself.  That the attorneys who are trained and experienced in these matters can, in fact, represent him, and I would be setting him up to be represented by ineffective assistance of counsel should I allow him to represent himself.  That would be absolutely improper in my estimation.

(*Id*. at 3-4.) Defense counsel then asked the court to allow Cassano to speak, which led to this exchange:

> The Court:    What do you want to say?
>
> Mr. Cassano:  **I'm going to say that I have a right to be co-counsel with my attorneys.**
>
> The Court:    You read that in the Constitution somewhere, Mr. Cassano?
>
> Mr. Cassano:  <u>Ferretta [*sic*] v. California</u>.
>
> The Court:    What I'm saying is that I can't allow you to represent yourself when it would be setting you up to have ineffective assistance of counsel. I had indicated that I'm willing to look into that further, but at this point we're going to proceed with these gentlemen, all trained experienced gentlemen to represent you, and it would be highly inappropriate to act otherwise at this point.

(*Id*. at 4-5 (emphasis added).)

Cassano alleges his final demand to represent himself took place at a pretrial hearing on April 23, 1999, three days before his trial began. The court asked Cassano to speak about the issue of whether or not he wanted a jury trial. (Doc. 135-4 at 91.) Cassano replied he did, because his counsel told him it was "the best thing for [him]." (*Id.*) Cassano then told the judge he had another "concern": "[M]y lead counsel, which is Andy Love, he's not going to be prepared for my trial, because he's still at this other one, and I would like my lead counsel to be here and be prepared when my trial starts." (*Id*. at 91-92.) Attorney Gatterdam explained to the judge that Attorney Love had been occupied with another capital trial and unable to work on Cassano's case for the past month, and the judge asked Cassano if he had "anything else . . . to say in that regard[.]" (*Id*. at 92-93.) Cassano stated: "Yes. **Is there any possibility I could represent myself?** I'd like that to go on

43

record." (*Id*. at 93 (emphasis added).)  The judge replied:

> We've talked about it before.  I think I'd be doing you a disservice by allowing that.  You have very competent and very engaged attorneys and I believe they should be representing you.  It would be in your best interest not to represent yourself.  I wouldn't be representing myself if I were charged.

(*Id*. at 93-94.)  The prosecutor then stated:

> The State would like to have an opportunity to make a record regarding the defendant's request that I think he's essentially asking that the case be continued so that Andrew Love would have a chance to prepare more.

(*Id*. at 94.)  Cassano did not speak at the pretrial again.  Attorney Gatterdam, however, in further discussing Attorney Love's preparedness for trial, explained,

> . . . [T]he issue really is that Mr. Love is the only attorney at this table – not at this table today, but the only attorney that is certified under Criminal Rule 20 as lead counsel.  I think that's what Mr. Cassano was talking about is that he wants his lead counsel here and prepared.
>
> Mr. Love will be here, but he will not be prepared to try this case.

(*Id*. at 97.)  After this discussion, the court announced the trial would start at the scheduled time because defense counsel were well prepared and reiterated that belief "for the benefit of Mr. Cassano."  (*Id*. at 99-100.)  The trial began three days later, on April 26, 1999, and Cassano did not ask again to represent himself.

Cassano argues that his first two requests for self-representation – the May 1998 written "Waiver of Counsel" and his oral statement to the trial court at the September 1998 hearing – were clear and unequivocal assertions of his right to represent himself that should be viewed as separate from and independent of his May 1998 motion for substitute counsel and his September 1998 motion to appoint co-counsel.  (Doc. 138 at 20-21.)  However, courts must examine all circumstances surrounding a request for self-representation to

determine whether it was a clear and unequivocal assertion of that right. *See, e.g., Faretta*, 422 U.S. at 836 (concluding that "under these circumstances" defendant was deprived of right to conduct his own defense); *United States v. Frazier-El,* 204 F.3d 553, 560 (4th Cir. 2000) (finding no "unequivocal desire to invoke his right of self-representation . . . [t]aking the record as a whole . . . ."). And here, it was neither unreasonable nor clearly erroneous for the Ohio Supreme Court to find that, under the circumstances, Cassano's first two requests to represent himself were not clear and unequivocal.

Cassano claims he filed the May 1988 motion for new counsel as "an alternative pleading asking the court to appoint substitute counsel if, and only if, the trial court did not allow him to waive counsel and self-represent." (Doc. 144 at 8-9.) He points out that some court have found that alternative motions were not evidence of equivocation regarding self-representation. (*Id*. at 8 (citing *Williams v. Bartlett*, 44 F.3d 95, 100 (2nd Cir. 1994), and *Johnstone v. Kelly*, 808 F.2d 214, 216 n.2 (2nd Cir. 1986).) The May 1998 "Waiver of Counsel" therefore remained pending throughout the trial, he concludes, and should have been addressed under *Faretta;* he should not be penalized for "fail[ing] to be a pest" by filing multiple duplicative motions to waive counsel and proceed *pro se*. (Doc. 138 at 21-22; Doc. 144 at 11-12.)

It is true that Cassano's May 1998 "Waiver of Counsel" was a clear statement of his desire to waive counsel and represent himself. But his equivocation about his legal representation at that time was even clearer. Cassano filed the motion to appoint new counsel and waiver of counsel separately, and neither pleading stated that they were filed in the alternative. Moreover, Cassano did not object when the trial court promptly granted his

motion for substitute counsel and appointed new attorneys, without ever ruling on the waiver issue. Indeed, as the Ohio Supreme Court emphasized, Cassano did not expressly ask to represent himself again until the April 23, 1999, pretrial hearing, after he had been represented by his new attorneys for more than ten months. A defendant's "solicitation of or acquiescence in certain types of participation by counsel" can waive his *Faretta* rights. *McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984). And as the state court reasonably concluded, Cassano abandoned his May 1988 request to waive counsel when he accepted new counsel without complaint, heeded the judge's warnings about the risks of representing oneself at the September 1998 hearing, and did not ask to represent himself again until ten months after he filed the "Waiver of Counsel," when his trial was set to begin and he felt his lead counsel was unprepared.

Cassano's claim that he clearly asserted his right to self-representation by "oral motion" at the September 1998 pretrial hearing is similarly unpersuasive. Cassano never asked to proceed *pro se* at that hearing; to the contrary, he specifically requested hybrid representation though his "Motion for Appointment of Co-Counsel" and his statement to the court asserting his "right to be co-counsel with [his] attorneys." Cassano contends the record shows that the trial judge "discern[ed]" at the hearing that he still wanted to represent himself alone because the judge said, "I can't allow you to represent yourself when it would be setting you up to have ineffective assistance of counsel." (Doc. 138 at 20-21 (quoting Doc. 135-1 at 4-5).) But the judge was responding there to Cassano's statement that he "ha[d] a right to be co-counsel with [his] attorneys" – not an assertion that he wanted to proceed with no counsel at all. (*See* Doc. 135-1 at 4-5.) Cassano also argues

his "Motion for Appointment of Co-Counsel" should be disregarded because he filed it after the hearing that day only "in response to" the judge's denial of his request to represent himself.  (Doc. 144 at 10.)  He notes that the motion was time-stamped at 3:13 p.m., and the hearing "took place" that morning at 9:30 a.m.  But that is not clear from the record.  While the trial court's docket shows the hearing was scheduled for 9:30 a.m., the transcript of the proceeding does not state the time the hearing actually occurred.  Furthermore, the judge stated at the hearing that he was addressing "a motion to appoint co-counsel to represent him while he represents himself" – not a "Waiver of Counsel" – and was "going to overrule that motion . . . ."  (Doc. 135-1 at 3.)  And even if Cassano's "Motion for Appointment of Co-Counsel" was filed after the hearing, it is reasonable to assume the judge had the motion in hand at the time of the hearing since he specifically referred to it.

The Ohio Supreme Court, therefore, reasonably found that Cassano's initial demands regarding representation "focused on hybrid representation," to which he had no constitutional right, *see, e.g., McKaskle*, 465 U.S. at 183 (criminal defendant has no constitutional right to hybrid representation), and in which case a *Faretta* inquiry was not required, *see Cromer*, 389 F.3d at 682-83 (holding *Faretta* procedures are not required where a defendant "merely seeks to supplement his counsel's representation").  At no point during this time period did he unambiguously demonstrate to the trial judge that he wanted just to represent himself and did not want counsel.  *See Frazier-El*, 204 F.3d at 560 ("[W]e are satisfied that the district court was justified, when confronted with Frazier–El's vacillation between his request for substitute counsel and his request for self-representation, in insisting that Frazier–El proceed with appointed counsel.");  *Cromer*, 389 F.3d at 683

("Requiring an articulate and unmistakable demand of the right to proceed *pro se* decreases the danger of a savvy defendant manipulating [the] two mutually exclusive rights [to counsel and to self-representation] to put the district court in a Catch–22. A defendant who seeks merely to supplement his counsel's representation . . . has failed to avail himself of his right to self-representation and thus failed to waive his right to the assistance of counsel.").

The Ohio Supreme Court also reasonably concluded that Cassano did not "unequivocally and explicitly invoke his right to self-representation, even on April 23, 1999," when he asked the court if he could represent himself at a pretrial hearing three days before trial. *Cassano*, 96 Ohio St. 3d at 100. Instead, as the court found, Cassano posed the question "only in the context of supporting his last-minute request for delay." *Id.*

Numerous courts have held that a defendant's question about the right to self-representation is an insufficiently clear and unequivocal assertion of that right. *See, e.g., United States v. Pena,* 279 Fed. Appx. 702, 706–07 (10th Cir. 2008) (finding no clear and unequivocal request when defendant asked "Can I represent myself?" in the middle of a colloquy with the judge primarily concerning his dissatisfaction with current counsel); *United States v. Light*, 406 F.3d 995, 998-99 (8th Cir. 2005) (finding no unequivocal request for self-representation where defendant asked, "What's the rule on representing yourself?" in context of warnings to defendant about his behavior); *Burton v. Collins*, 937 F.2d 131, 133-34 (5th Cir. 1991) (holding that asking "May I represent myself?" was not a clear and unequivocal request in the circumstances). Cassano posed his query about representing himself in the midst of a lengthy discussion regarding his lead counsel's lack

of preparation for his approaching trial. (*See* Doc. 135-4 at 91-100.) It was the only time he mentioned self-representation at the hearing, and he qualified his request by stating he wanted it "to go on record." (*Id.* at 93.) Although, as Cassano argues, he did not formally request a continuance for his trial at the hearing, he made his concern about that issue clear to the court. (*Id.* at 91-92.) And as Respondent points out, far from rejecting his counsel's representation at the hearing, just before he asked to represent himself, Cassano informed the court that he had decided to follow his counsel's advice to agree to a jury trial because "it was the best thing for [him]." (*Id.* at 91.) In this context, it was reasonable for the state court to view Cassano's question about proceeding *pro se* more as an expression of frustration with his lead counsel's preparedness and his desire to delay his trial than a clear and unequivocal desire to represent himself and waive counsel, rendering a *Faretta* inquiry unnecessary.

In any event, as the Ohio Supreme Court held, Cassano's alleged invocation of his self-representation right at the April 1999 pretrial hearing was untimely.[9] While *Faretta* did not establish a bright-line rule for timeliness, it emphasized that the defendant's

_____

[9] Cassano argues the Ohio Supreme Court was "simply wrong" in finding "Cassano did not mention that he wanted to represent himself alone until April 23, 1999, only three days before trial." (Doc. 144 at 12 (citing *Cassano*, 96 Ohio St. 3d at 100).) As explained above, the Court agrees that Cassano expressed a desire for self-representation in his May 1988 "Waiver of Counsel." Nevertheless, in light of his simultaneous request for new counsel, which was granted, and subsequent requests for hybrid representation, the "Waiver of Counsel" was not an explicit and unambiguous invocation of that right. The state court's ultimate decision that Cassano did not ask to represent himself in a sufficiently clear and timely manner, therefore, was not based on this factual finding so as to satisfy § 2254(d)'s unreasonable-determination-of-fact prong. *See Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) ("[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination.").

assertion of his self-representation right was "'[w]ell before the date of trial' and 'weeks

before trial.'" *Hill*, 792 F.3d at 678 (quoting *Faretta*, 422 U.S. at 807, 835). Cassano's

request, occurring three days before trial, fell far short of *Faretta*'s "weeks before trial"

benchmark. *See id.* at 678-79 (holding that state court's rejection of self-representation

claim did not unreasonably apply *Faretta* where petitioner requested self-representation just

as the trial was to begin, since "to the extent that *Faretta* addresses timeliness, as a matter

of clearly established law it can only be read to require a court to grant a self-representation

request when the request occurs weeks before trial").[10] And, as the Sixth Circuit recently

observed, "the U.S. Supreme Court has never held that a court must inquire into the basis

of a defendant's request [to represent himself at trial] before denying it as untimely." *Id.* at

678. "[T]he purpose of the [*Faretta*] inquiry is to inform the defendant of the hazards of

self-representation, not to determine whether a request is timely." *Id.*

Accordingly, the Ohio Supreme Court's decision upholding the trial court's denial

of Cassano's request to represent himself was neither contrary to, nor an unreasonable

application of, *Faretta* or any other clearly established Supreme Court precedent. Nor was

it based on any unreasonable determination of the facts in light of the evidence presented.

---

[10] The court in *Hill* cited as support for this proposition: *Marshall v. Taylor*, 395 F.3d 1058, 1060–61 (9th Cir. 2005) (discussing *Faretta*'s "timing element"); *United States v. Young*, 287 F.3d 1352, 1354 (11th Cir. 2002) ("The [*Faretta* ] Court mentioned the timeliness of the request in both the opening paragraphs and the breadth with which the Court announced its decision."); *Stenson v. Lambert*, 504 F.3d 873, 884 (9th Cir. 2007) ("*Faretta* does not articulate a specific time frame pursuant to which a claim for self-representation qualifies as timely.... The Supreme Court has never held that *Faretta*'s 'weeks before trial' standard requires courts to grant requests for self-representation coming on the eve of trial."); and *Miller v. Thaler*, 714 F.3d 897, 903 n.5 (5th Cir. 2013) (denying habeas relief on a claim that the state court violated *Faretta* in denying the defendant's self-representation request "a few hours before jury selection"). *Hill*, 792 F.3d at 678.

Cassano's first claim for relief lacks merit.

**B.    Second Claim for Relief:  *Right to Presence***

In his second claim for relief, Cassano argues that the trial court violated his due

process rights by denying his request to be present at the jury view of the prison cell crime

scene.  (Doc. 138 at 22-24.)  Cassano raised this claim on direct appeal in the Ohio

Supreme Court, which rejected it on the merits, making it ripe for habeas review.

Respondent contends the claim lacks merit.  (Doc. 141 at 46-49.)

The Ohio Supreme Court, the last state court to address this claim, stated:

{¶ 67} In proposition of law VI, Cassano argues that the trial court violated his
due process rights by denying his request to be present at the jury view of the
crime scene. Cassano does not claim that his counsel could not attend the view.

{¶ 68} Here, the trial court erred in denying Cassano his right to attend the jury
view. The statute, R.C. 2945.16, specifies that "[t]he accused has the right to
attend such view by the jury * * * ." The trial court erred, even though the court
acted as it did because of the complex logistical problems involved. The court
stated that prison authorities objected to the probable duration of the jury view.
Further, the court expressed concern that the prison would have to be locked
down, and Cassano would have been unshackled in his cell during the jury
view. While the trial court's concern is understandable, R.C. 2945.16 does not
grant the court any discretion.

{¶ 69} Nonetheless, the trial court's decision refusing to allow Cassano to be
present at the jury view did not deprive Cassano of due process. In *Snyder v.
Massachusetts* (1934), 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674, the United
States Supreme Court held that denial of a defendant's presence at a jury view
did not violate due process. The Snyder court recognized that "the presence of
a defendant [in a felony prosecution] is a condition of due process to the extent
that a fair and just hearing would be thwarted by his absence, and to that extent
only." S*nyder*, 291 U.S. at 107–108, 54 S.Ct. 330, 78 L.Ed. 674, overruled on
other grounds, *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d
653. Other courts have also rejected due process complaints when an accused
did not attend a jury view of a crime scene within prison walls. See, e.g., *Devin
v. DeTella* (C.A.7, 1996), 101 F.3d 1206; *Jordan v. State* (1981), 247 Ga. 328,
346, 276 S.E.2d 224, reversed on other grounds, *Jordan v. Lippman* (C.A.11,
1985), 763 F.2d 1265.

51

{¶ 70} Finally, the court's refusal to allow Cassano to attend the jury view did not materially prejudice Cassano. We have recognized that the jury's "view of a crime scene is neither evidence nor a crucial stage in the proceedings." *Richey*, 64 Ohio St.3d at 367, 595 N.E.2d 915, citing *Tyler*, 50 Ohio St.3d at 38, 553 N.E.2d 576. See, also, *State v. Zuern* (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585; *State v. Sanders* (2001), 92 Ohio St.3d 245, 265, 750 N.E.2d 90. We also note that the trial court authorized Cassano, his counsel, and any agent to view the crime scene before trial. Cassano has failed to show that his due process rights were violated or that he suffered prejudice because of the court's refusal to allow him to attend the jury view. We reject proposition of law VI.

*Cassano*, 96 Ohio St. 3d at 105-06.

The Constitution guarantees a criminal defendant the right to be present at trial. *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (noting the right to presence is "rooted to a large extent in the Confrontation Clause of the Sixth Amendment . . . [and] the Due Process Clause in some situations"). But this right, like the right to represent oneself, is not absolute. It exists only "at [a] stage of the criminal proceeding that is critical to its outcome" and "if [the defendant's] presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). "[T]his privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow' . . . ." *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934) (overruled in part on other grounds)). Whether a defendant has been improperly excluded from a trial proceeding must be considered in light of the whole record. *Snyder*, 291 U.S. at 115.

The Supreme Court specifically has held that criminal defendants do not have an absolute right to be present at a jury view. In *Snyder v. Massachusetts*, the Supreme Court held that a trial court did not violate a defendant's due process rights by excluding him from an on-site jury inspection where the defendant's attorney was present and participated,

52

along with the prosecutor, in directing the jury's attention to various aspects of the location. *Id*. at 107-08. The Court explained that "the presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id*. And a defendant's presence at a jury view is not among those constitutional rights "conferred so explicitly as to leave no room for an inquiry whether prejudice to a defendant has been wrought through their denial." *Id*. at 116. In that case, the Court found no prejudice, noting that the presence of counsel at the jury view "supplie[d] an additional assurance that nothing helpful to either side [would] be overlooked upon the view." *Id*. at 113.

Here, Cassano requested before trial that his counsel and "agents" be permitted to view the crime scene and take pictures and/or video of the scene. (Doc. 134-2 at 34.) The trial court granted the motion, adding that Cassano himself may participate. (*Id*. at 54.) Cassano later moved for a jury view of the scene, which the court also granted. (*Id*. at 118; Doc. 134-4 at 207.) Defense counsel then asked that Cassano be allowed to attend the jury view. (*See* Doc. 135-12 at 97.) The court denied the request, stating:

> Request has been made by the defendant he be allowed to go on the view. I decided that the jury is going to the institution to look at the cell and not the defendant. There is no reason to be there. There's no – it's not part of the evidence. The view is not part of the evidence. It's not an integral part of the trial as it were.
>
> There's complications and problems of taking him there will far outweigh any benefit of having him there, so I'm going to deny him that opportunity.

(*Id*. at 97-98.) Defense counsel objected "[f]or the record." (*Id*. at 98.) The prosecutor replied, "I would assume one of the reasons for your ruling is also security reasons." (*Id*. at 99.) The court explained, "Absolutely. And the complications of him having to be in

53

shackles and not being free to walk about. That would just be totally inappropriate." (*Id.*)

Cassano first argues that the trial court violated his "absolute right" to attend the jury view under Ohio law. (Doc. 138 at 22-23 (citing Ohio Rev. Code § 2945.16).) Federal habeas courts, however, do not consider issues of state law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Cassano also asserts that the Ohio Supreme Court's decision rejecting his due process presence claim misapplies federal constitutional law and is based on unreasonable determinations of fact. (Doc. 138 at 23.) He cites *Snyder* for the proposition that "'his presence ha[d] a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" (*Id.* (quoting *Snyder*, 291 U.S. at 105-06).) He also refers to *Faretta v. California,* 422 U.S. 806, 819 n.15 (1975)*,* and *Stincer*, 482 U.S. at 745, for the general principal that an accused has a constitutional right to be present at all stages of trial. (Doc. 138 at 23; Doc. 144 at 14-15.) He contends his presence at the jury view was "vital" and "crucial" to his defense of self-defense, as the entire crime occurred in the prison cell and he needed to assist his counsel at the jury view "in correcting any factual mistakes, or using the information gained . . . ." (Doc. 144 at 15.)

But Cassano does not explain why *Snyder* is not controlling here. The Supreme Court did not modify *Snyder* by ruling in either *Faretta* or *Spincer* that the right to presence at trial is absolute; rather, in line with *Snyder*, the Court held in those cases that the right exists only "where [the defendant's] absence might frustrate the fairness of the proceedings." *Faretta*, 422 U.S. at 819 n.15; *accord Stincer*, 482 U.S. at 745 (defendant's presence required only where it "would contribute to the fairness of the procedure").

Nor has Cassano shown that *Snyder* does not apply here because, for some reason, his absence from the jury view, unlike the defendant's in *Snyder*, rendered his trial unfair. As the Ohio Supreme Court observed, Cassano, along with his counsel and agents, was granted access to the crime scene before trial. Cassano does not explain exactly how he could have further assisted his attorneys had he also attended the jury view. Moreover, as the Supreme Court noted in *Snyder*, Cassano's counsel were present at the jury view and able to inform him about what the jury saw and heard, so Cassano was still able to help them evaluate information gleaned at the viewing, just after the fact. As in *Snyder,* therefore, Cassano has failed to demonstrate how his absence from the jury view so prejudiced him that he was denied a fair trial. *See Rogers v. Howes*, 64 Fed. Appx. 450, 453-54 (6th Cir. 2003) (applying *Snyder* and finding petitioner's absence from jury view did not violate his due process rights where nothing prejudicial occurred at the jury view and defense counsel was present); *Devin v. DeTella*, 101 F.3d 1206, 1208-09 (7th Cir. 1996) (applying *Snyder* to habeas petitioner's right-to-presence claim where his exclusion from jury view of prison crime scene did not deny him a fair trial).

The Court finds, therefore, that the Ohio Supreme Court's decision denying Cassano's right-to-presence claim was not contrary to, or an unreasonable application of, *Snyder* or other Supreme Court precedent; nor was it based on an unreasonable determination of fact. This claim also fails.

### C. Third Claim for Relief: *Right to be Free of Restraints*

Cassano argues for his third claim for relief that the trial court erred by ordering him to wear both a stun belt and shackles during trial. (Doc. 138 at 24-26.) Cassano litigated

this claim in state courts, and it is preserved for federal habeas review.[11]  Respondent

argues, however, that it lacks merit.  (Doc. 141 at 49-54.)

The last state court to address this claim was the Ohio Supreme Court on direct

review.  It reasoned:

> {¶ 52} In proposition of law III, Cassano argues that the trial court abused its
> discretion by directing that his feet be shackled during the trial without making
> "findings or conduct[ing] an evidentiary hearing." Before trial, Cassano,
> through counsel, asked to appear at all hearings without restraints. At a hearing
> on April 1, 1999, the parties argued the issue. The state presented a summary
> of Cassano's prison record that reflected multiple threats to other inmates and
> a significant amount of fighting. The defense did not offer contrary evidence.
> On April 21, the court ordered that Cassano be restrained with leg shackles. On
> April 23, the court ordered that counsel tables be skirted so that the shackles
> would not show.

> {¶ 53} At the start of trial on April 26, 1999, the defense suggested that despite
> the skirting, the jurors might be able to discern that Cassano was shackled. The
> court responded that shackles were necessary because Cassano had a history of
> violent crime and that he might attempt to "bolt through that door." Later, the
> court recognized that jurors might have glimpsed the leg shackles.

---

[11] Respondent argues that Cassano's claim as it relates to the trial court's order that he wear
a stun belt (as opposed to the shackles) is procedurally defaulted because he did not raise that
particular claim on direct appeal or in his amended post-conviction petition in state courts.  (Doc.
141 at 50-51.)  Determining when a claim has been "fairly presented" because of variations in
legal theory or factual allegations "is contextual and individual to each case."  *Houston v. Waller*,
420 Fed. Appx. 501, 509 (6th Cir. 2011).  "In some instances, simply presenting the facts, without
also presenting 'the constitutional claim . . . inherent in those facts' is insufficient. . . .  In others,
however, 'the ultimate question for disposition will be the same despite variations in the legal
theory or factual allegations urged in its support.'"  *Id.* (quoting *Picard v. Connor*, 404 U.S. 270,
277 (1971) (internal quotation marks and citations omitted)).  Here, Cassano references the stun
belt in the heading and argument section for this claim.  The substance, or the fundamental legal
and factual basis, of his restraint claim, however, focuses on the shackling and its impact on the
fairness of his trial, as it did in state court.  The fact that he had to wear a stun belt in addition to
the shackles is a fact to be considered, but does not alter the legal analysis of the claim.  Cassano's
reference to a stun gun, therefore, is not a separate sub-claim subject to the procedural-default
doctrine.

{¶ 54} We have stated that "no one should be tried while shackled, absent unusual circumstances." *State v. Kidder* (1987), 32 Ohio St.3d 279, 285, 513 N.E.2d 311. "However, shackling is left to the trial court's sound discretion." *State v. Richey* (1992), 64 Ohio St.3d 353, 358, 595 N.E.2d 915, citing *103 *State v. Woodards* (1966), 6 Ohio St.2d 14, 23, 35 O.O.2d 8, 215 N.E.2d 568. See, e.g., *Woodards v. Cardwell* (C.A.6, 1970), 430 F.2d 978, 982 (trial court must exercise its own discretion and not leave the issue up to security personnel). Several courts have upheld the use of restraints in trials. See, e.g., *Harrell v. Israel* (C.A.7, 1982), 672 F.2d 632; *Kennedy v. Cardwell* (C.A.6, 1973), 487 F.2d 101; *State v. Curry* (Sept. 30, 1997), Scioto App. No. 95CA2339, 1997 WL 600056; *State v. Bell* (June 6, 1997), Scioto App. No. 96CA2472, 1997 WL 317425.

{¶ 55} In this case, Cassano has not demonstrated that the trial court abused its discretion in directing that his legs be shackled. Both of Cassano's hands were free throughout the trial. Moreover, the court held a hearing and considered the evidence presented, i.e., Cassano's prison record, before finding that unobtrusive leg shackles, hidden by a skirt, were necessary. Cassano's prior convictions, his status as an inmate in a maximum security prison, and his documented history of violence even while in custody combine to convince us that the trial court did not abuse its discretion in requiring Cassano to be shackled.

{¶ 56} Moreover, jurors knew that Cassano was an inmate and a convicted murderer, and they might have expected to see him restrained during his court appearances. Cassano never asked for a cautionary jury instruction on the issue. Thus, as to an instruction, he waived all but plain error, which is not present. The fact that Cassano was tried while wearing hidden leg shackles did not deprive him of a fair trial even though jurors might have been able to discern the shackles. See, e.g., *Harrell*, 672 F.2d at 637; *Fountain v. United States* (C.A.7, 2000), 211 F.3d 429, 435–436. We reject proposition of law III.

*Cassano*, 96 Ohio St. 3d at 102-03.

The right to a fair trial is a "fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). And "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Id*. "'[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not

on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). Certain practices pose such a threat to the presumption of innocence and attendant "fairness of the fact-finding process" that they require "close judicial scrutiny." *Williams,* 425 U.S. at 503-04.

One aspect of trial that courts have examined carefully is the physical appearance of criminal defendants when brought before a jury, as they are "generally entitled to the physical indicia of innocence" at trial. *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973). Shackling a defendant during trial is an "inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial." *Flynn*, 475 U.S. at 568-69; *see also Kennedy,* 487 F.2d at 111 (noting that "shackles should only be used as a last resort" and "only upon a *clear showing* of necessity" (emphasis original)). "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Yet, in certain situations, "binding and gagging might possibly be the fairest and most reasonable way to handle" a disruptive and obstreperous defendant, *id*., or to prevent a defendant's escape, *Kennedy,* 487 F.2d at 111-12.

Cassano argues the Ohio Supreme Court misapplied Supreme Court precedent and unreasonably determined facts in rejecting his claim that the trial court erred in ordering that he wear both shackles on his legs and an electric stun belt at trial. (Doc. 138 at 26.)

He challenges the trial court's ruling on both procedural and substantive grounds.

Cassano contends the trial court erred procedurally by ruling on the issue of restraints at the September 25, 1998, hearing and later in a written order without conducting a proper hearing on the matter. (*Id*. at 24; Doc. 144 at 18.) He is mistaken.

On June 5, 1998, Cassano filed a motion with the trial court requesting that he be permitted to appear at all proceedings without restraints. (Doc. 134-2 at 14.) Defense counsel raised the motion again at the September 1998 hearing and indicated the State opposed it.[12] (Doc. 135-1 at 8.) The trial court denied the motion, stating,

> I will not allow the defendant in the courtroom without restraints, but I will allow the prosecuting attorney, the sheriff's department, and the corrections officers to place an electronic belt on the defendant so that if he gets out of hand we can handle that. Then we'll base the further lack of restraints or further restraints based on the defendant's conduct.
>
> To the extent that he acts like a gentleman in the courtroom, he'll be treated like one. To the extent he doesn't, he'll be treated the way he acts.

(*Id*. at 9.) Defense counsel did not comment further on this issue at the hearing.

Defense counsel did, however, raise the restraints issue again at a pretrial hearing on April 1, 1999. He explained to the judge that he thought the court had previously ruled that Cassano would be shackled at pretrial procedures but not in front of the jury. (Doc. 135-2 at 6.) The trial court then conducted a hearing on the matter. (*Id*. at 6-11.)

Defense counsel argued that under Supreme Court and Sixth Circuit precedent, shackling Cassano at trial would greatly prejudice him and was unnecessary, stating:

> The State or the sheriff's office and MANCI, I believe, have probably worked

---

[12] The Court could not find a written response to the motion from the State in the appendix to the return of writ.

together on security arrangements, and there's no showing at this time that those are insufficient to make sure that this Court, which ultimately is in charge of the security in the courtroom, to make sure that the security is taken care of.

It's my understanding that they have – the sheriff's office has use of a stun belt, which we would encourage being used as opposed to shackles, because obviously, that's less incisive. It allows freedom of movement of Mr. Cassano. Also it takes care of the security issues for the sheriff's office and for MANCI. Also it does not show the jurors that Mr. Cassano is shackled.

I realize there are other options that can be used, such as skirting. However, Mr. Cassano is going to have to move about, and even the shackles could be heard and it could be particularly uncomfortable if he has to do this for several weeks during trial. I think it sends a message to the jury that he is a dangerous inmate who – and I realize that they are going to know he's an inmate.

(*Id*. at 7-8.)

The State responded. After summarizing case law on the issue, the prosecutor

argued:

In this case, Your Honor, as has been already admitted and brought before the Court, the Court intends to place a stun belt on the defendant who is going to be in plain clothes. The stun belt's not going to be viewable by the jury. It's going to be underneath the defendant's clothing.

If the defendant was shackled, he'd have only shackles on his legs. He's going to have long pants. Almost all of the shackles would be hidden from the jury. As this Court has already stated, this Court intends to have the defendant seated prior to a jury being brought into the courtroom, and the jury is going to be brought out of the courtroom while the defendant is seated. Any type of exposure to the defendant would be minimal. And if a skirt is placed on both tables, there would be absolutely none. The jury would not even know that the defendant was shackled.

In this case we have a defendant who is on trial for aggravated murder with a death penalty specification – two specifications, actually. The defendant is currently serving a conviction for ag murder and it's a life sentence. The defendant has a previous conviction while he was in prison for felonious assault.

And in that case on January 31st, 1992, the defendant stabbed another inmate approximately 30 times. The inmate did survive. If we look through the

defendant's institutional summary report, which the State can provide as part of the record, the defendant has multiple instances of threats to other inmates, fighting –

(*Id*. at 9-11.)  The trial court later decided,

> The Court has the duty to maintain courtroom security and to make sure that is – a system is set up for that purpose.  The Court has sound – is required to use sound discretion in determining what restraints should be available.  The Court will make an order in that regard forthwith.

(*Id*. at 11.)

On April 21, 1999, the court issued an order providing:

> Defendant's request to appear at all proceedings without restraints will not be granted.  This defendant has proven on many occasions (the Court has reviewed the defendant's prison record) to be violent.  Defendant shall wear an electronic stun belt under his clothing and shall have leg restraints on his ankles. Defendant shall not be moved around the courtroom in the presence of the jury.

(Doc. 134-4 at 207.)

Before trial began, defense counsel renewed their objection to the shackling, but the court maintained its position.  (Doc. 135-4 at 112-13.)  Defense counsel objected again after it became apparent that the skirting would not prevent the jury from seeing the shackles on Cassano's legs.  (Doc. 135-5 at 22-23.)  He argued that the stun belt would provide adequate security without the shackles, which created "the impression . . . that [Cassano was] too dangerous even in a courtroom to be left unshackled."  (*Id*. at 23.)  The trial court acknowledged that, at that point, "there's just no way to prevent the jury from knowing that the defendant had shackles on."  (*Id*. at 22.)  He stated he did not "want to accentuate the fact that he is and will remain shackled," but at the same time, he did not "want anybody on the jury who is inane enough to not realize the defendant is an inmate and continues to be an inmate."  (*Id*.)

61

The record shows, therefore, that, as the Ohio Supreme Court correctly found, the trial court did in fact conduct a thorough hearing on the issue of restraints, in which it considered both parties' arguments and evidence, including his prison record. And Cassano does not present any evidence or argument refuting the record.

Cassano further argues that the court "conducted an improper, personal investigation and cited rumors that undesirable people might attend the trial as a justification for shackling." (Doc. 138 at 25.) As support for this claim, he cites the trial judge's comment on the record that he had heard a rumor from a former ManCI employee that members of the Aryan Brotherhood may attend the trial to support Cassano. (Doc. 135-5 at 26-27.) After mentioning this rumor, however, the court reaffirmed that its ruling requiring shackles was based only on Cassano's violent behavior and the risk of his escape, stating:

> The reason the defendant is being shackled is because he has a violent history of violent crime. His chance of getting any chances outside the institution are to bolt through that door. There's no question about why he's being shackled. It's because of this sort of thing.

(*Id*. at 27.)

Substantively, Cassano claims the shackles were unnecessary because he also wore a stun belt. (Doc. 144 at 16-21.) Moreover, he argues, the skirting did not conceal his shackles from the jury, making this "overt display[] of security . . . 'inherently prejudicial.'" (Doc. 138 at 25-26 (quoting *Holbrook*, 475 U.S. at 568-69).)

Given Cassano's history of violence, however, the Ohio Supreme Court was not unreasonable to affirm the trial court's direction that Cassano's legs be shackled. As the state court noted, there was a high degree of security risk if Cassano were unrestrained

given his prior convictions, status as an inmate of a maximum security prison, and history of violence even while in custody. And the trial court attempted to minimize the chance the jury would see the shackles by skirting the counsel tables and limiting Cassano's movement in front of the jury. Although that effort was not entirely successful, the jury was well aware that Cassano was an inmate and convicted murderer. Therefore, while Cassano is correct that shackling is "inherently prejudicial" – the Supreme Court has held as much – the restraints used here did not render Cassano's trial so unfair as to violate his due process rights. The trial court had a compelling state interest in maintaining the security of the courtroom due to Cassano's history of violence, and "less drastic security precautions . . . [would] not [have] provide[d] the needed protection." *Kennedy*, 487 F.2d at 111 (holding that shackling was necessary because the petitioner had escaped from prison twice).

The Ohio Supreme Court's decision rejecting this claim, therefore, was neither contrary to, nor an unreasonable application of, Supreme Court precedent, and Cassano's third claim for relief is meritless.

### D. Fourth Claim for Relief: *Right to Public Trial*

Cassano's fourth claim for relief alleges the trial court erred by closing a pretrial suppression hearing to the public despite the fact he requested that it be closed. (Doc. 138 at 26-27.) Cassano raised his public-trial claim on direct appeal in the Ohio Supreme Court, which adjudicated it on the merits. It is therefore preserved for federal habeas review. Respondent argues the claim lacks merit. (Doc. 141 at 54-58.)

In rejecting this claim, the Ohio Supreme Court opined:

{¶ 61} In proposition of law V, Cassano argues that the trial court denied him his constitutional right to a public trial. During pretrial hearings on April 23,

63

1999, Cassano's counsel asked that a suppression hearing involving testimony about Cassano's felonious assault of Angelo be closed to the public to avoid prejudicial pretrial publicity. The prosecution did not object, and the court granted Cassano's request. After five witnesses testified, the in-camera stage ended. The court noted that the media could reenter; whether the doors were reopened is not on the record. After a few other matters were discussed, the hearing ended.

{¶ 62} We have long recognized that "the right to a public trial * * * is a fundamental guarantee of both the United States and Ohio Constitutions." *State v. Lane* (1979), 60 Ohio St.2d 112, 14 O.O.3d 342, 397 N.E.2d 1338, paragraph two of the syllabus. Moreover, "the right to a public trial * * * extends to pretrial proceedings." *State ex rel. The Repository, Div. of Thompson Newspapers, Inc. v. Unger* (1986), 28 Ohio St.3d 418, 421, 28 OBR 472, 504 N.E.2d 37. Accord *State ex rel. Dispatch Printing Co. v. Lias* (1994), 68 Ohio St.3d 497, 502, 628 N.E.2d 1368.

{¶ 63} In *Press–Enterprise Co. v. Superior Court of California for Riverside Cty.* (1986), 478 U.S. 1, 13–14, 106 S.Ct. 2735, 92 L.Ed.2d 1, the Supreme Court of the United States noted that under the First Amendment, a preliminary hearing could not be closed (even at the defendant's request) "unless specific, on the record findings * * * demonstrat[e] that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest,' " citing *Press–Enterprise v. Superior Court of California, Riverside Cty.* (1984), 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629. In *Waller v. Georgia* (1984), 467 U.S. 39, 47, 104 S.Ct. 2210, 81 L.Ed.2d 31, the United States Supreme Court held that the Press–Enterprise standards requiring strict justification for closure applied to pretrial suppression hearings.

{¶ 64} In this case, we conclude that the trial court erred in closing the suppression hearing without conducting a separate hearing, making findings justifying such closure, and considering alternatives to closure. See *Waller*, 467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31. However, reversal is not required because Cassano invited the error by requesting closure. "A party cannot take advantage of an error he invited or induced." *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408. Accord *State v. Murphy* (2001), 91 Ohio St.3d 516, 535, 747 N.E.2d 765 (accused "actively responsible" for error cannot complain).

{¶ 65} Moreover, closure did not affect the fairness, integrity, or public reputation of the trial. Cf. *United States v. Olano* (1993), 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508. The evidence received was later heard at the public trial. Even when a defendant objected to closure, reversal of the conviction was required only when a new public suppression hearing would

result in suppression of material evidence not suppressed earlier. See *Waller*, 467 U.S. at 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31. Nothing in the record suggests that another hearing would affect the result in this case.

{¶ 66} Cassano also argues that the trial court remained closed after the in-camera hearing ended. The record is unclear about whether the court remained closed. Morever, any failure immediately to reopen the pretrial hearing was brief, inadvertent, and simply a continuation of the original invited error caused by Cassano. See, e.g., *Peterson v. Williams* (C.A.2, 1996), 85 F.3d 39, 43–44 (brief and inadvertent continuation of proper courtroom closing not noticed by participants did not violate Sixth Amendment); *United States v. Al–Smadi* (C.A.10, 1994), 15 F.3d 153, 154–155. We reject proposition of law V.

*Cassano*, 96 Ohio St. 3d at 104-05.

Criminal defendants have the right under the Sixth Amendment to a public trial. *Waller v. Georgia*, 467 U.S. 39, 44 (1984). "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Id*. at 46. The right to a public trial extends to pretrial suppression hearings, as those hearings often resemble bench trials, at which witnesses testify and important factual matters are decided regarding the conduct of police and prosecutors in seizing evidence. *Id*. at 45.

The right to a public trial, however, "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial . . . ." *Id*. "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id*. When a defendant objects to the closure of a suppression hearing, therefore, the court must conduct a hearing and apply the following test:

"The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the

65

closure order was properly entered."

*Id*. at 47 (quoting *Press-Enterprise Co. v. Superior Court of California* (*"Press-Enterprise I"*), 464 U.S. 501, 510 (1984)).  If the court finds the defendant's public-trial right was violated by a closed suppression hearing, a new trial is required only if a new suppression hearing results in a different outcome.  *Id.*  If "essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest."  *Id*.

When a defendant *requests* a closed preliminary hearing, as in this case, a different constitutional right is implicated – the First Amendment rights of the press and public. *Press-Enterprise Co. v. Superior Court of California* ("*Press-Enterprise II*"), 478 U.S. 1, 7 (1986).  Openness of criminal trials "'enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'"  *Id*. at 9 (quoting *Press-Enterprise I*, 464 U.S. at 501).  With suppression hearings, "[t]he public in general . . . has a strong interest in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny."  *Waller*, 467 U.S. at 47.  But, again, even when this First Amendment "right of access" attaches, "it is not absolute."  *Press-Enterprise II*, 478 U.S. at 9.  The Court has explained,

> [T]he explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public. The central aim of a criminal proceeding must be to try the accused fairly, and "[o]ur cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant."

*Waller*, 467 U.S. at 46 (quoting *Gannett Co. v. De Pasquale*, 443 U.S. 368, 392-93 (1979)).

Before closing a preliminary hearing, even at the defendant's request, the court must apply the

balancing-of-interests test described above. *Press-Enterprise II*, 478 U.S. at 9-10.

In this case, the Ohio Supreme Court found the trial court erred in closing the suppression hearing without meeting the procedural safeguards outlined in *Waller* and the *Press-Enterprise* cases. What Cassano challenges here is the Ohio Supreme Court's conclusion that despite the trial court's error, reversal was not required, because: (1) Cassano invited the error when he requested the hearing be closed; and (2) the closure did not affect the fairness of his trial.[13] (Doc. 144 at 21-22.) He contends the trial court committed a structural error not subject to either invited-error or harmless-error review, essentially arguing that reversal in his case was mandated. (*Id.*)

Cassano is correct that a violation of a defendant's right to a public trial is structural error. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017). But the Supreme Court has explained that this "means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was harmless beyond a reasonable doubt." *Id.* at 1910. It does not mean that every public-trial violation requires a new trial. *Id.* at 1909 (noting that "not every public-trial violation results in fundamental unfairness"). In *Waller*, after finding the trial court erred by closing a suppression hearing, the Court did not order a new trial; instead, it ordered a new suppression hearing that was open to the public, and

---

[13] Cassano argues the state court's decision was based on an unreasonable determination of fact in violation of § 2254(d)(2) in addition to misapplying Supreme Court precedent in violation of § 2254(d)(1). (Doc. 138 at 27.) But he fails to identify one fact that he claims was erroneous, and the Court therefore will not consider that argument. *See, e.g.,United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

only if the hearing resulted in a different outcome would a new trial be necessary. *Waller*,

467 U.S. at 49-50.

Moreover, Cassano presents no Supreme Court precedent to support his assertion

that structural errors "are not subject to" the invited-error doctrine, and this Court can find

none. Indeed, the Ohio Supreme Court's application of the invited-error rule to a public-

trial violation is consistent with Supreme Court precedent. *See Early v. Packer*, 537 U.S. 3,

8 (2002) (per curiam) (a state-court decision need not refer to relevant Supreme Court cases

or even demonstrate an awareness of them; it is sufficient that the result and reasoning are

consistent with Supreme Court precedent). Courts employ the invited-error rule to "prevent

a party from inducing an erroneous ruling and later seeking to profit from the legal

consequences of having the ruling set aside." *Harvis v. Roadway Exp., Inc.*, 923 F.2d 59,

61 (6th Cir. 1991) (internal quotation marks omitted). The rule "is a branch of the doctrine

of waiver." *Id*. And the Supreme Court has recognized that a defendant can waive his right

to a public trial if he either acquiesces to the closure of the courtroom or fails to object to it.

*See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 896 (1991) ("the Sixth

Amendment right to a trial that is 'public[]' provide[s] benefits to the entire society more

important than many structural guarantees; but if the litigant does not assert [it] in a timely

fashion, he is foreclosed"); *Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine

v. United States*, 362 U.S. 610, 619 (1960), for the proposition that "failure to object to

closing of courtroom is waiver of right to public trial"). The Court has explained that

enforcing such a waiver is fair and appropriate in the absence of extreme circumstances,

such as judicial or prosecutorial misconduct or great prejudice to the defendant, stating:

> This is not a case where it is or could be charged that the judge deliberately
> enforced secrecy in order to be free of the safeguards of the public's scrutiny;
> nor is it urged that publicity would in the slightest have affected the conduct of
> the proceedings or their result. Nor are we dealing with a situation where
> prejudice, attributable to secrecy, is found to be sufficiently impressive to
> render irrelevant failure to make a timely objection at proceedings like these.
> This is obviously not such a case. Due regard generally for the public nature of
> the judicial process does not require disregard of the solid demands of the fair
> administration of justice in favor of a party who, at the appropriate time and
> acting under advice of counsel, saw no disregard of a right, but raises an
> abstract claim only as an afterthought on appeal.

*Levine*, 362 U.S. at 619.

Here, too, Cassano clearly "saw no disregard of a right" when he requested that the suppression hearing be closed; his counsel stressed their "concerns over the possible taint for the potential jurors in this matter . . . given the sensitive nature of this information" – especially evidence about Cassano's prior knife attack on a prison cell mate.  (*See* Doc. 135-4 at 19.)  And he offers no argument regarding any prejudice he suffered because the hearing was closed or any other reason the closure rendered his trial fundamentally unfair. Rather, he raises this federal habeas claim "seeking to profit from the legal consequences of having the ruling set aside."  *Harvis*, 923 F.2d at 61.  The Ohio Supreme Court reasonably concluded, therefore, that the trial court's error did not require reversal because Cassano requested the closure.  *See Harrison v. Woods*, No. 15-1046, 2015 WL 4923099, at *2 (6th Cir. Aug. 18, 2015) (finding state-court decision denying public-trial claim was not contrary to clearly established federal law where petitioner's attorney "affirmatively assented" to trial court's decision to close the courtroom to the media during jury selection and "the Supreme Court has held that an attorney's failure to request an open court results in waiver").

The Ohio Supreme Court also reasonably decided that, in any event, the closure did not affect the "fairness, integrity, or public reputation of the trial." *Cassano*, 96 Ohio St. 3d at 105. As the state court correctly observed, the Supreme Court held in *Waller* that even when a defendant objects to the closure of a suppression hearing, "[a] new trial need be held only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties." *Waller*, 467 U.S. at 50. And the state court found nothing in the record in Cassano's case to suggest a second suppression hearing would have resulted in a different outcome. *Cassano*, 96 Ohio St. 3d at 105. As will be explained below, Cassano has not demonstrated that the admission of the evidence challenged at the hearing, including evidence of Cassano's prior knife attack, was unduly prejudicial and should have been excluded from trial.

Moreover, again, Cassano does not challenge the propriety of the trial court's decision granting his request for closure, only the court's procedural error in failing to conduct a separate hearing on his closure request and to make the required findings. As the Supreme Court recently observed, "It would be unconvincing to deem a trial fundamentally unfair just because a judge omitted to announce factual findings before making an otherwise valid decision to order the courtroom temporarily closed." *Weaver*, 137 S. Ct. at 1909-10.

Accordingly, the Ohio Supreme Court's decision rejecting Cassano's public-trial claim, therefore, was neither contrary to, nor an unreasonable application of, Supreme Court precedent. This claim is denied.

**E.** **Fifth Claim for Relief:** *"Other Acts" Evidence*

In his fifth claim for relief, Cassano argues the trial court erred by admitting

evidence of his prior knife attack on Inmate Angelo, drug use, and sexual proposals to

Angelo. (Doc. 138 at 28-29.) Cassano raised this claim in state courts on direct appeal.

Respondent concedes the claim is therefore properly preserved for federal habeas review,

but argues it is meritless.[14] (Doc. 141 at 58-62.)

The Ohio Supreme Court was the last state court to review this claim, stating:

> {¶ 43} In proposition of law II, Cassano argues that the trial court erred and that
> he was unfairly prejudiced when it admitted evidence showing Cassano's
> criminal propensity. Cassano particularly complains about evidence that he
> stabbed inmate Troy Angelo in 1992.
>
> {¶ 44} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is
> not admissible to prove" a defendant's propensity toward criminal behavior. "It
> may, however, be admissible [to show] motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or accident." The exception

---

[14] The Court notes that the Ohio Supreme Court found Cassano waived his claims
regarding the admission of evidence of his drug use and sexual proposals because he "either failed
to object to the evidence at trial or his counsel elicited the evidence on cross-examination."
*Cassano*, 96 Ohio St. 3d at 102. And the court found no plain error occurred. *Id.* These claims,
therefore may be procedurally defaulted. *See State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998)
(Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by
calling it to the attention of the trial court at a time when the error could have been avoided or
corrected); *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006) (failure to adhere to the
"firmly-established" contemporaneous objection rule is "an independent and adequate state
ground" upon which to find federal habeas claims procedurally defaulted); *Ohler v. United States*,
529 U.S. 753, 755-56 (2000) ("Generally, a party introducing evidence cannot complain on appeal
that the evidence was erroneously admitted." (citing 1 J. Weinstein & M. Berger, Weinstein's
Federal Evidence § 103.14, p. 103–30 (2d ed. 2000)); *Keith,* 455 F.3d at 673 ("the Ohio Supreme
Court's plain error review does not constitute a waiver of the state's procedural default rules and
resurrect the issue . . ."). Respondent does not argue that this claim is procedurally defaulted,
however, so that defense is waived. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural
default is normally a defense that the State is obligated to raise and preserv[e] if it is not to lose the
right to assert the defense thereafter." (internal quotation marks and citations omitted)).

allowing the evidence "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

{¶ 45} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Thus, we review the trial court's decision on an abuse-of-discretion standard. See *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233; *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126. We conclude that the trial court did not abuse its discretion in admitting the evidence relating to the stabbing of Angelo. That evidence helped to establish "prior calculation and design," a key element of the aggravated murder charge against Cassano.

{¶ 46} Cassano mentioned his record to prison authorities several times in an attempt to dissuade prison authorities from assigning a cellmate to him. Evidence about the attack against Angelo explains the significance of Cassano's remarks about his record. In short, Cassano's own demands that prison officials check his record made evidence of his assault against Angelo relevant in his trial.

{¶ 47} Moreover, that evidence was otherwise relevant to Cassano's "motive" and his "plan" within the context of Evid.R. 404(B). The attacks on Angelo and Hardy were similar. In both cases, Cassano was angry at an inmate and stabbed the inmate in a locked cell, using a shank tied to his wrist by a string. In both assaults, Cassano repeatedly stabbed the inmate predominantly in the face, head, neck, chest, and back.

{¶ 48} Finally, we conclude that the evidence of the assault on Angelo was harmless and that Cassano's substantial rights were not prejudiced. At trial, Cassano testified that he had been in over one hundred fights in prison and had stabbed four people. Thus, the jury would have known about Cassano's criminal behavior.

{¶ 49} Moreover, we find that the evidence of Cassano's guilt was overwhelming. While in a locked prison cell, Cassano stabbed his cellmate approximately seventy-five times, using a knife tied to his wrist, and then attempted to claim self-defense. That Cassano was the killer was proven beyond a reasonable doubt.

{¶ 50} Cassano also complains that Angelo introduced evidence of other criminal acts that Cassano had committed. Angelo disclosed that in 1992, Cassano used drugs and made sexual proposals to Angelo. This evidence

formed part of Angelo's explanation about the motive for the assault. Although we find that evidence to be of questionable relevance, Cassano either failed to object to the evidence at trial or his counsel elicited the evidence on cross-examination. No plain error occurred.

{¶ 51} Since the trial court did not err in admitting the "other acts" evidence in the trial phase, the jury could properly consider it during the penalty phase. The evidence related to Cassano's "history, character, and background," which a jury must consider in the penalty phase. R.C. 2929.04(B). See, e.g., *State v. Waddy* (1992), 63 Ohio St.3d 424, 428, 588 N.E.2d 819. We reject proposition of law II.

*Cassano*, 96 Ohio St. 3d at 101-02.

To the extent Cassano's claim alleges violations of Ohio evidentiary law, it is not cognizable on federal habeas review. Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012). Federal habeas courts presume that state courts correctly interpret state law in their evidentiary rulings. *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005). Specifically, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) (noting that federal habeas courts "do not pass upon 'errors in the application of state law, especially rulings regarding the admission or exclusion of evidence'") (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)).

Nevertheless, state-court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d

542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). A state-court evidentiary ruling, therefore, will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights. *C*oleman, 244 F.3d at 542. But they must be "so egregious that [they] result[]in a denial of fundamental fairness." *Bugh*, 329 F.3d at 512. And "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id.* (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

Cassano's entire argument supporting this claim is this: "Regardless of the reasons offered, it is clear the prosecution offered this evidence for the improper purpose of establishing a propensity for violence." (Doc. 138 at 28.) He does not identify the challenged evidence with citations to the record or present any developed factual or legal argument demonstrating the trial court erred in admitting the evidence. Nevertheless, the Court finds the trial court's admission of the challenged evidence was not so fundamentally unfair that it violated Cassano's due process rights.

As the Ohio Supreme Court reasonably found, evidence of Cassano's prior attack on the inmate Angelo was relevant to his own testimony about his statements to prison officials concerning his past conduct toward inmates, his motive to eliminate unwanted cell mates, and his distinct style of attack. *See Coleman*, 244 F.3d at 543 (concluding that evidence of prior murder was admissible because it demonstrated petitioner's modus operandi in murder at issue). Moreover, as the state court noted, Cassano himself testified about his violent nature. On cross-examination, and in response to testimony that he told an inmate he preferred stabbing to fist fighting, Cassano testified that he had "been in over

74

100 fights since [he had] been locked down in 23 years." (Doc. 135-24 at 62-63.) He also testified that he had stabbed two other people. (*Id*. at 63-64.)

In addition, the Court also agrees with the state court that evidence of Cassano's drug use and sexual proposals was of "questionable relevance." But Cassano does not refute the state court's finding that his counsel either did not object to the evidence or elicited it on cross-examination. Nor does he identify where in the record the objectionable evidence was introduced. Nevertheless, the Court notes that Angelo testified about Cassano's drug use without objection from the defense (Doc. 135-21 at 96), and defense counsel elicited testimony from Angelo on cross-examination about Cassano's sexual proposals (*id*. at 117-21). The admission of this testimony, therefore, was not fundamentally unfair. *See, e.g., Ohler v. United States*, 529 U.S. 753, 755-56 (2000) ("Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." (citing 1 J. Weinstein & M. Berger, <u>Weinstein's Federal Evidence</u> § 103.14, p. 103–30 (2d ed. 2000)).

Thus, the trial court's admission of evidence regarding Cassano's attack on Angelo, sexual proposals to Angelo, and drug use did not so seriously impugn the fundamental fairness of his trial as to amount to a denial of due process. This claim, therefore, is not cognizable on federal habeas review, and it, too, fails.

### F. Sixth Claim for Relief: *Ineffective Assistance of Trial Counsel*

Cassano's sixth claim for relief alleges his trial counsel provided constitutionally ineffective assistance. Specifically, he alleges trial counsel:

1. failed to investigate Judge Henson's relationship with ManCI and its personnel, and to request the judge's withdrawal and/or recusal from

his case on that basis;

2. failed to challenge juror misconduct;

3. failed to investigate, develop, and present evidence of mitigating factors during the penalty phase of the trial, including evidence regarding his mental health;

4. failed to place into the trial record the prison records the trial court reviewed in connection with his motion to be free of restraints at trial, ensuring all discussions with the court about that issue were recorded;

5. agreed to him wearing an electronic stun belt during trial;

6. failed to object to the trial judge's personal investigation of Cassano and ex-parte communications with former ManCI staff, which the judge used as the basis for his decision to have him shackled during trial;

7. failed to object to and/or elicited evidence of his drug use and sexual advances in connection with the 1992 assault of inmate Angelo;

8. failed to challenge Ohio's death penalty scheme for violating international law and the Supremacy Clause of the Constitution;

9. failed to object to improper questions, remarks, and arguments of the prosecutors;

10. failed to object to improper victim impact evidence, including evidence of the victim's character, behavior, and vulnerability;

11. failed to object to improper jury instructions at both the guilt and penalty phases of trial; and

12. requested that the April 23, 1999, suppression hearing be closed.

(Doc. 138 at 29-35; Doc. 144 at 22-28.)[15]  Respondent argues the claims are procedurally

defaulted and/or meritless.  (Doc. 141 at 62-91.)

---

[15] Respondent contends that Cassano raises a separate claim that counsel failed to prepare for trial.  (Doc. 141 at 70-74.)  Cassano explains that the issue of counsel's preparedness for trial is not a separate claim, but instead provides evidentiary support for his other, specific ineffective-assistance claims.  (Doc. 144 at 22-24.)  The Court agrees.

1.      **Procedural Posture**

Cassano raised in state courts on direct appeal sub-claims 11 (jury instructions) and

12 (hearing closure), as listed above, on direct appeal, and sub-claims 1 (recusal request)

and 3 (mitigating evidence) on post-conviction review. The state courts addressed those

claims on the merits, and they are preserved for federal habeas review.

Respondent correctly maintains that the remaining sub-claims (2 and 4-10) were

never raised in state court and are therefore procedurally defaulted.[16] (Doc. 141 at 66-68.)

Each of these claims arises out of the record of proceedings in the trial court, and therefore

could have been raised on direct appeal.[17] Cassano failed to do so, however, and, under

---

[16] Respondent also argues that Cassano has raised new trial counsel ineffective-assistance sub-claims in his amended petition that do not relate back to the ineffective-assistance claims in his original petition as required by Federal Civil Rule 15(c), and therefore are untimely under AEDPA's one-year statute of limitations. (Doc. 141 at 64.) But he identifies only two of the allegedly untimely sub-claims: one relating to juror misconduct (*id*. at 66) and one regarding the presentation of mitigating evidence (*id*. at 77). And he does not provide any argument as to how the allegedly new claims "impermissibly alter [his ineffective-assistance claim] outside the statute of limitations." (*Id*. at 66.) Cassano, for his part, addresses only the timeliness of his mitigation sub-claim. (Doc. 144 at 24-25.) He points out that his original petition asserted that trial counsel "'failed to fully prepare and present Mr. Cassano's case in mitigation,'" and his amended petition does not alter the substance of that claim, but instead merely flushes out the supporting facts and argument. (*Id*. (quoting Doc. 26 at 22).) The Court agrees. Cassano's mitigation ineffective-assistance claim in the amended complaint relates back to the claim alleged in the original petition, because the original petition placed Respondent "on notice that he could be called to answer for the allegations in the amended pleading." *Durand v. Hanover Ins. Group, Inc.*, 806 F.3d 367, 375 (6th Cir. 2015) (internal quotation marks and citation omitted). "[T]here is an identity between the amendment and the original complaint with regard to the general wrong suffered and with regard to the general conduct causing such wrong." *Id.* (internal quotation marks and citation omitted). As to the juror-misconduct ineffective-assistance sub-claim, because the Court finds that claim procedurally defaulted and meritless, it declines to address the statute-of-limitations issue.

[17] In Ohio, claims of ineffective assistance of trial counsel do not have to be raised on direct appeal, for *res judicata* purposes, if the defendant is represented by the same counsel on direct appeal as he was at trial. *See State v. Cole*, 2 Ohio St. 3d 112, 114 n.1 (Ohio 1982) (noting that because "counsel cannot realistically be expected to argue his own incompetence, *res judicata*

Ohio law, *res judicata* now prohibits him from raising the issues in any post-conviction proceeding. *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal). With no state-court remedies still available to him, Cassano has defaulted these claims. *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").

Cassano generally asserts that "when [his ineffective-assistance] claim is reviewed in its entirety, it . . . was properly presented in State Court" and is not procedurally defaulted. (Doc. 144 at 22.) Otherwise, he does not directly address Respondent's procedural-default defense with respect to the defaulted sub-claims or offer any argument regarding the cause for, or prejudice resulting from, his procedural default of the claims.[18]

---

does not act to bar a defendant represented by the same counsel at trial and upon direct appeal from raising a claim of ineffective assistance of counsel in a petition for postconviction relief"). Here, however, Cassano was represented on direct appeal by new counsel.

[18] Cassano's only specific response to Respondent's charge that his ineffective-assistance claims are procedurally defaulted is that his assertion that trial counsel failed to prepare for trial is not a separate claim of ineffective assistance and therefore is not procedurally defaulted. (Doc.

Nor does he contend that he is actually innocent such that the default should be excused.

Cassano does, however, raise claims here that his appellate counsel were ineffective for failing to raise all but two of the defaulted trial counsel ineffective-assistance claims – namely, the claims that counsel should have challenged at trial juror misconduct and Ohio's death penalty scheme as violating international law and the Supremacy Clause. (*See* Doc. 138 at 42-43.) Those two sub-claims (listed above as sub-claims 2 and 8), therefore, are procedurally defaulted.

"Attorney error that constitutes ineffective assistance of counsel is cause." *Coleman v. Thompson*, 501 U.S. 722, 754 (1991). This includes the ineffective assistance of appellate counsel. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986). However, claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim if the ineffective-assistance claim *itself* is procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).

As will be explained below in reference to Cassano's ninth and tenth claims for relief, Cassano claims that his appellate counsel were ineffective for failing to raise the following defaulted trial counsel ineffective-assistance claims asserted here: sub-claims 4, 5, 6, 7, 9, 10. Of those, two appellate counsel ineffective-assistance claims are themselves procedurally defaulted because Cassano's reopening application was untimely, and cannot provide cause to excuse the procedural default of two underlying trial counsel

---

144 at 23.) But as noted above, the Court agrees with Cassano's characterization of his assertion regarding counsel's failure to prepare as a fact supporting his more specific complaints about counsel's conduct.

ineffective-assistance claims: sub-claims 5 and 7.[19] The remaining appellate counsel

ineffective-assistance claims are not procedurally defaulted, but still cannot provide cause

to excuse the default of the underlying trial counsel ineffective-assistance claims because

they are insufficiently developed.

Accordingly, sub-claims 2 and 4 through 10, as listed above, of Cassano's trial

counsel ineffective-assistance claim are procedurally defaulted.

## 2. Merits

Cassano's preserved claims of ineffective assistance of trial counsel fail on the

merits. The Supreme Court has long recognized that the Sixth Amendment right to the

effective assistance of counsel at trial "is a bedrock principle in our justice system."

*Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012); *see also Gideon v. Wainwright*, 372 U.S.

335, 342-44 (1963). The Court announced a two-prong test for claims of ineffective

assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the

petitioner must demonstrate that counsel's errors were so egregious that "counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id* at 687.

To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing

court must find that the representation fell "below an objective standard of reasonableness."

---

[19] Cassano also cannot claim that the ineffective performance of his appellate counsel in connection with his reopening application, as asserted in his tenth claim for relief, provides cause to overcome the procedural default of his appellate counsel ineffective-assistance claims. Cassano complains that his appellate counsel failed to request the appointment of counsel to file a reopening application immediately upon entry of the court's direct appeal judgment, and failed to advise Cassano of reopening procedures and deadlines so that he could file a timely *pro se* application. (*See* Doc. 138 at 45-46.) As explained below, this is not a cognizable federal habeas claim and therefore cannot provide cause for the procedural default of other claims.

*Id.* at 688.  It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id*. at 693 (citation omitted).  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.*  Ineffective-assistance claims are mixed questions of law and fact. *Id.* at 698.  Habeas courts review such claims, therefore, under AEDPA's "unreasonable application" prong, § 2254(d)(1). *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003).

"'Surmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356. 371 (2010)).  The Supreme Court has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted).  Therefore, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to

eliminate the distorting effects of hindsight . . . ." *Strickland,* 466 U.S. at 689. "*Strickland*

specifically commands that a court 'must indulge [the] strong presumption' that counsel

'made all significant decisions in the exercise of reasonable professional judgment,'"

recognizing "'the constitutionally protected independence of counsel and . . . the wide

latitude counsel must have in making tactical decisions.'" *Cullen v. Pinholster*, 563 U.S.

170, 195 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

Indeed, the standards imposed by *Strickland* and § 2254(d) are both "highly

deferential," so that in applying them together, "review is 'doubly' so." *Harrington,* 562

U.S. at 105 (internal quotation marks and citations omitted). The Supreme Court has

cautioned:

> Federal habeas courts must guard against the danger of equating
> unreasonableness under *Strickland* with unreasonableness under § 2254(d).
> When § 2254(d) applies, the question is not whether counsel's actions were
> reasonable. The question is whether there is any reasonable argument that
> counsel satisfied *Strickland's* deferential standard.

*Id*.

*Recusal request.* Cassano's first ineffective-assistance claim alleges that trial

counsel were ineffective for failing to investigate the judge's relationship with ManCI and

then request the judge's recusal from the case on that basis. (Doc. 138 at 30-31.) The last

state court to address this claim was the court of appeals on post-conviction review. It

reasoned:

> {¶ 54} Appellant first claims that counsel was ineffective for failing to seek
> disqualification of Judge Henson based on his contact with MANCI. For the
> reasons stated in the third assignment of error, appellant has not demonstrated
> that the result of the proceeding would have been different had counsel
> successfully sought disqualification of Judge Henson. Nothing in the record
> supports appellant's claim that the judge was biased against him or had outside

information on which he based his decision in accepting the jury's recommendation of death, and the sentence was independently reviewed by the Ohio Supreme Court and found to be appropriate.

*Cassano*, 2013 WL 1858614, at *7.

As explained below with regard to Cassano's underlying judicial-bias claim, Cassano has not shown that the trial judge was biased due to his relationship with ManCI and ManCI personnel. It follows, therefore, that the state appellate court reasonably found defense counsel was not ineffective for failing to seek the judge's disqualification for that reason. This sub-claim fails.

*Mitigating evidence*. Cassano next complains that his counsel failed to investigate, develop, and present evidence at the mitigation phase of trial. (Doc. 138 at 31-34.) Specifically, he argues his attorneys failed to develop a "coherent mitigation strategy," prepare witnesses, present "any mental health or psychological evidence," and provide prison records regarding his mental health to a "competent expert"; and counsel waived a presentence investigative report and psychological examination before the mitigation proceedings and the court's sentencing. (*Id*.)

The state appellate court, the last state court to address this claim, reasoned on post-conviction review:

{¶ 56} Finally, appellant argues that counsel should have submitted evidence of his extensive mental illness in mitigation. Appellant attached documents concerning his mental illness treatment history in prison to his petition, as well as printouts from the Ohio Supreme Court web site showing that one of his trial attorneys was suspended after the trial and one was placed on medical leave and later suspended for failure to register.

{¶ 57} Appellant has presented no evidence that his trial attorneys' later disciplinary proceedings had any effect on his representation at trial.

83

{¶ 58} "A postconviction petition does not show ineffective assistance because it presents a new expert opinion that is different from the theory used at trial." *State v. Combs* (1994), 100 Ohio App.3d 90, 103, 652 N.E.2d 205, citing *State v. Jamison* (Sept. 19, 1990), Hamilton App. No. C–910736, unreported. Further, mitigation theories that are merely cumulative of the evidence presented at trial will not support a claim of ineffective assistance of counsel. *Id*.

{¶ 59} The medical records attached to appellant's petition concerning mental illness were almost all prepared after appellant was convicted and placed on death row, and thus counsel was not ineffective for failing to present this evidence which did not exist at the time of trial. Defense counsel did present evidence in mitigation that appellant was troubled when he was sentenced to a youth detention facility and came out even more anti-social, evidence that appellant's nine suicide attempts and hunger strikes while incarcerated were a plea for help, and evidence that the state's mistakes in their treatment of appellant throughout his incarceration led to his murder of Hardy. Evidence that appellant was treated for mental illness would have been mostly cumulative of this evidence.

{¶ 60} Further, as noted by the trial court, the strategy during sentencing was that society would be sufficiently protected by keeping appellant in prison, and more evidence of the likelihood that appellant would exhibit dangerous and unpredictable behavior was not helpful to that strategy. A petition does not show ineffective assistance simply because it sets forth a different strategy from that used at trial. *Combs*, supra.

*Cassano*, 2013 WL 1858614, at *8.

Counsel in capital cases have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). A capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" that counsel's role in the two proceedings is comparable: "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland,* 466 U.S. at 686.

Accordingly, the Supreme Court and Sixth Circuit have found ineffective assistance of counsel in capital cases where trial counsel failed to adequately investigate or present

mitigating evidence at sentencing. *See, e.g., Rompilla v. Beard,* 545 U.S. 374, 389-93 (2005) (counsel ineffective where he failed to examine court file of defendant's prior conviction which contained a range of vital mitigation leads regarding defendant's childhood and mental health problems); *Wiggins v. Smith*, 539 U.S. 510, 526, 534, 537 (2003) (counsel ineffective where they failed to discover and present "powerful" evidence of petitioner's "excruciating life history" and instead "put on a halfhearted mitigation case"); *Frazier v. Huffman*, 343 F.3d 780, 795-99 (6th Cir. 2003) (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's brain injury).

Nevertheless, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla,* 545 U.S. at 383. *See also Wiggins,* 539 U.S. at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland,* 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); *Burger v. Kemp*, 483 U.S. 776 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).

In state court, Cassano argued that his counsel "may have obtained his DRC files but there is no indication that the files were reviewed or utilized in investigating mitigation evidence and no mental health evidence was presented to the jury at sentencing[,] . . . depriv[ing] the jury of significant mitigating evidence." (Doc. 134-24 at 63.) He

contended that those prison records revealed a "significant mental health history," including prescriptions for drugs used to treat serious mental illness such as schizophrenia, manic-depression, and "combative and explosive behavior"; diagnoses of attention deficit hyperactivity disorder and bipolar disorder; a history of suicide attempts, self-mutilation and "other negative personal actions"; and at least six admissions to a psychiatric treatment facility and two occasions of involuntary medication. (*Id*. at 62.)[20]

The Ohio appellate court disagreed, reasonably concluding that additional evidence of Cassano's mental illnesses and treatments for the illnesses would have been "mostly cumulative" of evidence presented at the mitigation hearing. *Cassano*, 2013 WL 1858614, at *8. As the state court noted, Dr. Bartollas did in fact testify about Cassano's "psychological makeup" at the mitigation hearing. (*See* Doc. 135-28 at 32.) The sociology professor explained that he had reviewed Cassano's prison files and found many early signs that Cassano was "troubled," including his nine suicide attempts, cutting off part of his finger, hunger strikes, and "psychological fluctuation" for which he was prescribed "psychotropic drugs." (*Id*. at 30-31.)[21] The state court was reasonable to conclude that additional evidence of Cassano's mental illness would have been cumulative to Dr. Bartollas' testimony. *See White v. Mitchell*, 431 F.3d 517, 530 (6th Cir. 2005) ("The

---

[20] Similarly, in seeking discretionary review of the state appellate court's judgment by the Ohio Supreme Court, Cassano argued, "Presenting evidence of Cassano's significant and long term mental illness would have presented the jury with a drastically different picture of Cassano than that created by the trial, and most importantly, that created by the minimalistic evidence presented." (Doc. 134-26 at 51.)

[21] The Ohio Supreme Court on direct review provided a detailed summary of the evidence the defense presented at Cassano's mitigation hearing. *See Cassano*, 796 Ohio St. 3d at 114-16.

presentation of Dr. Kandiko's findings to the jury would have been cumulative, and therefore, White cannot establish prejudice by relying on this affidavit.").

The state appellate court also noted that defense counsel's strategy was to demonstrate that society would be safe if Cassano were sentenced to life in prison, and evidence of Cassano's "dangerous and unpredictable behavior" would have undermined that strategy. *Cassano*, 2013 WL 1858614, at *8. Plus, the court correctly observed, merely presenting a different strategy from the one used at trial does not demonstrate ineffective assistance. *Id*.; *see Strickland*, 466 U.S. at 690-91 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

Cassano takes a slightly different tack here. He explains that he is not alleging ineffective assistance because counsel did not present cumulative evidence of his mental health, hire an alternative expert, or employ a different strategy. (Doc. 144 at 27.) Rather, he now contends that trial counsel, based on the information they possessed at the time of trial, should have further investigated and developed evidence of his mental health to *support* their theory that life imprisonment would sufficiently protect society by showing that "he suffered from a mental illness at the time of the murder, that he was not receiving proper treatment for such illness at the time, and that effective treatment was available that would lessen his aggressive tendencies . . . ." (*Id*. at 28.)

This argument does not help Cassano. It rests on the (considerable) assumption that

if he had "received a proper diagnos[is] of a mental health disorder . . ., proper treatment would [have been] available . . . [to] stop[] potential aggressive tendencies." (*Id*. at 25.) Cassano cites a prison record indicating he was prescribed a medication in March 1998 that a website currently claims "can reduce aggressive behavior and the desire to hurt yourself/others."[22] (Doc. 144 at 26-27 (quoting http://www.webmd.com/drugs/2/drug-9543/thorazine-oral/details).) But aside from that one piece of evidence, Cassano does not specify any "treatment plan" that was readily available at the time of his trial and proven to "curb any and all aggressive tendencies" as he posits. (*Id*. at 27.) He therefore has not "overcome the presumption that, under the circumstances," his counsel's investigation of his mental health was adequate and "'might be considered sound trial strategy.'"

*Strickland*, 466 U.S. at 689 (citations omitted). As the Supreme Court has explained,

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained. It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

*Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009) (quoting *Strickland*, 466 U.S. at 699). Nor has Cassano shown that evidence of an available treatment for "aggressive tendencies" would have so persuaded the jury that it would have resulted in a different sentence. Prejudice under *Strickland* is not demonstrated where "one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different." *Baze*

---

[22] The prison record, which Cassano submitted with his post-conviction petition, states that the drug, Thorazine, was prescribed to "[i]mprove[]" Cassano's "thinking, emotion, and general functioning" and "stop[] or reduce[]" his "[h]earing voices." (Doc. 134-21 at 38.)

*v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004).

Accordingly, the Ohio appellate court reasonably concluded that Cassano's trial counsel were not constitutionally deficient in their presentation of mitigating evidence and Cassano was not prejudiced by their failure to present additional evidence of his mental illnesses and potential treatments for those illnesses. The state court's decision was neither contrary to, nor an unreasonable application of, *Strickland* or its progeny.

*Jury instructions and suppression hearing closure.* Cassano claims his trial counsel also were ineffective for failing to object to allegedly "improper" jury instructions at both the guilty and penalty phases of trial and for moving to exclude the media from the April 23, 1999, suppression hearing. (Doc. 138 at 35.) He does not, however, provide any legal or factual argument whatsoever to support these claims in either his amended petition or traverse. He does not specify, for example, which jury instructions allegedly were improper or explain how he was prejudiced by the media's absence at a hearing in which evidence was heard about a past crime so similar to the murder for which he was being tried. The Court, therefore, will not address those claims. *See, e.g.,United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) (""[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v.*

*Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).[23]

The Court finds, therefore, that Cassano's sixth claim for relief lacks merit.

**G.      Seventh, Eighth, and Fourteenth Claims for Relief:  *Ohio's Post-Conviction Review Procedures***

 Cassano challenges the constitutionality of his state post-conviction proceedings in his seventh, eighth, and fourteenth claims for relief.  He contends his due process and equal protection rights were violated when the trial court denied his requests for funding of experts and investigators.  (Doc. 138 at 35-37.)  He also argues he was denied effective assistance of counsel when post-conviction counsel failed to: (1) prevent him from waiving his right to post-conviction review; (2) seek a hearing to determine his competency to waive post-conviction review; and (3) file a notice of appeal of the trial court's dismissal of his post-conviction petition.  (*Id*. at 38-41.)  And he broadly asserts that Ohio's post-conviction review process "did not provide him an adequate corrective process to fully and fairly vindicate his federal constitutional claims in the Ohio courts under principles of comity and Federalism."  (*Id*. at 59-63.)

These claims are not cognizable on federal habeas corpus review.  The Sixth Circuit has held that "the writ [of habeas corpus] is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings . . . because the

---

[23] Cassano similarly provides general, conclusory assertions – often in just a single sentence and with no legal or factual argument – of his procedurally defaulted trial counsel ineffective-assistance claims (relating to juror misconduct; the submission of prison records relating to the issue of restraints; the use of a stun belt; the trial judge's personal investigation of him; drug use and sexual advances evidence; Ohio's death penalty scheme; prosecutorial misconduct; and victim impact evidence).  (*See* Doc. 138 at 31, 34-35.)  For that reason, the Court also will not conduct an alternative merits analysis of those claims.

claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986) (following *Preiser v. Rodriguez*, 411 U.S. 475 (1973)); *see also Leonard v. Warden, Ohio State Penitentiary,* 846 F.3d 832, 854-55 (6th Cir. 2017) (declining to revisit *Kirby*'s holding that habeas corpus cannot be used to challenge Ohio's post-conviction framework and noting absence of Supreme Court precedent to the contrary); *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) ("errors in post-conviction proceedings are outside the scope of federal habeas corpus review").

Claims of ineffective assistance of post-conviction counsel also are not cognizable on habeas review. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *see also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (holding that prisoners have no constitutional right to an attorney in state post-conviction proceedings and therefore cannot claim constitutionally ineffective assistance of counsel in such proceedings).

Accordingly, Cassano's seventh, eighth, and fourteenth claims for relief do not state cognizable grounds for habeas corpus relief and are dismissed.

**H.     Ninth and Tenth Claims for Relief:** *Ineffective Assistance of Appellate Counsel*

In his ninth and tenth claims for relief, Cassano alleges his appellate counsel provided constitutionally ineffective assistance. He faults appellate counsel for not raising on direct appeal the following claims:

1.     trial counsel were ineffective for failing to object to evidence of the

91

victim's good character and vulnerability;

2.    trial counsel were ineffective for failing to object to the decision to have him wear an electronic stun belt during the trial;

3.    trial counsel were ineffective for failing to place into the record the prison records the trial court reviewed in connection with his motion to be free of restraints at trial, and ensuring all discussions with the court about that issue were recorded;

4.    trial counsel were ineffective for failing to object to the trial judge's personal investigation of him and ex-parte communications with former ManCI staff, which the judge used as the basis for his decision to have him shackled during trial;

5.    trial counsel were ineffective for requesting that the April 23, 1999 suppression hearing be closed;

6.    trial counsel were ineffective for failing to object to and/or eliciting evidence of his drug use and sexual advances in connection with the 1992 assault of Inmate Angelo;

7.    trial counsel were ineffective for failing to object to improper questions, remarks, and arguments of the prosecutors;

8.    trial counsel were ineffective for failing to object to improper victim impact evidence;

9.    trial counsel were ineffective for failing to fully investigate, prepare, and present mitigation evidence;

10.   the trial court erred by failing to make the prison records it examined in relation to its decision to shackle him part of the record;

11.   the trial court erred by conducting a personal investigation and contacting unnamed witnesses in relation to its decision to shackle him; and

12.   prosecutorial misconduct at the pretrial, guilt, and sentencing phases of trial.

(Doc. 138 at 42-43.)  Cassano further asserts that appellate counsel were ineffective for:

13.   failing to present to the Ohio Supreme Court a complete and accurate

record and statement of the relevant facts on which to rely; and

14. failing to move the Ohio Supreme Court for appointment of counsel to file a reopening application immediately upon entry of the court's direct appeal judgment, and failing to advise Cassano of reopening procedures and deadlines so that he could file a *pro se* application.

(*Id*. at 43, 45-46.)

## 1. Procedural Posture

In Ohio, capital defendants claiming ineffective assistance of appellate counsel must apply to the Ohio Supreme Court for reopening of the direct appeal within ninety days of the issuance of the Ohio Supreme Court's mandate on direct appeal unless the appellant can demonstrate "good cause" for filing the application at a later time. Ohio S. Ct. Prac. R. 11.06(A) (this rule was designated as Ohio S. Ct. Prac. R. XI, § 5(A) when Cassano filed his application). Cassano filed his reopening application on June 21, 2004, nearly two years after the Ohio Supreme Court issued its final judgment on direct appeal. (*See* Doc. 134-14 at 77.) He argued he had good cause for his delayed application because: (1) he had a constitutional right to appointed counsel to file the application and any delay caused by the lack of appointed counsel constituted good cause; and (2) the Sixth Circuit held in *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000), that because Ohio's reopening process was a continuation of the direct appeal, defendants had a constitutional right to effective assistance of counsel with respect to filing a reopening application, and failure of appellate counsel to file a timely reopening application constituted ineffective assistance of counsel and good cause.[24] (Doc. 134-15 at 42.) The court denied the application on timeliness

_____

[24] The Sixth Circuit expressly overruled *White v. Schotten* in *Lopez v. Wilson*, 426 F.3d 339, 352 (6th Cir. 2005), ruling that Ohio's reopening procedure was part of post-conviction

grounds. (Doc. 134-16 at 34.)

Respondent correctly argues that four of the sub-claims Cassano presents here are procedurally defaulted because they were never raised in state court: sub-claims 1, 2, 5, and 6, as listed above. (Doc. 141 at 98.) *See, e.g., Beach v. Moore*, 343 Fed. Appx. 7, 13 (6th Cir. 2009) (finding appellate counsel ineffective-assistance claim procedurally defaulted where petitioner never it raised in state courts and "the time . . . to present the claim to the Ohio courts has run"). Moreover, Cassano offers no argument regarding the cause for, or prejudice resulting from, the default, or that he is actually innocent. Sub-claims 1, 2, 5, and 6, therefore, are procedurally defaulted.

Respondent maintains the remaining sub-claims are not procedurally defaulted even though the Ohio Supreme Court denied his reopening application as untimely. He points to the Sixth Circuit's decision in *Franklin v. Anderson*, 434 F.3d 412, 419 (6th Cir. 2006), which he contends held that the Ohio court rule regarding the deadline for filing reopening applications was not an adequate and independent state procedural bar to preclude federal habeas review of claims asserted in reopening applications filed between 2000 and 2004, due to the Ohio Supreme Court's "fluctuating" treatment of untimely applications.[25] (Doc. 141 at 98-99, 102.)

---

review rather than the direct appeal process and therefore carried with it no federal constitutional right to assistance of counsel.

[25] Although Cassano filed his reopening application directly with the Ohio Supreme Court under Ohio S. Ct. Prac. R. XI, § 5, capital defendants who committed their crimes before January 1, 1995, appealed their convictions and sentences first to the Ohio Court of Appeals, and sought reopening of their direct appeals in those courts under Ohio Appellate Rule 26(B). *See* Ohio App. R. 26(B); *State v. Murnahan*, 63 Ohio St. 3d 60 (1992).

The Court notes that it is at least arguable that Cassano also never raised sub-claim10, as listed above, in state courts, and that sub-claims 7 and 12 are so broad and vague that their procedural history is undeterminable. In addition, it is not clear that *Franklin* applies to Cassano's claims. *See Van Hook v. Bobby*, 661 F.3d 264, 270 (6th Cir. 2011) ("This circuit has already held at least three times . . . that [the] requirement that claims of ineffective assistance of appellate counsel must be filed in applications for reconsideration and Rule 26's timeliness standard are adequate and independent state grounds."); *Landrum v. Mitchell*, 625 F.3d 905, 917 (6th Cir. 2010) (noting that *Franklin* concerned the Ohio Supreme Court's application of Rule 26(B)'s filing deadline to cases filed before the rule's effective date in 1993, so "*Franklin*'s discussion of the Ohio Supreme Court's subsequent treatment of Rule 26(B) is thus *dicta*"); *Parker v. Bagley*, 543 F.3d 859, 861 (6th Cir. 2008) (finding that although Rule 26(B) was not firmly established in 1993, "it had become firmly established by 1996"); *Fautenberry v. Mitchell*, 515 F.3d 614, 641-42 (6th Cir. 2008) (limiting *Franklin*'s reach by holding that in determining whether Rule 26(B) was "firmly established and regularly followed," courts must determine "whether, at the time of the petitioner's actions giving rise to the default, the petitioner could ... be deemed to have been apprised of the rule's existence").

Nevertheless, procedural default must be raised as a defense or it is waived. *Trest v. Cain*, 522 U.S. 87, 89 (1997). Respondent, therefore, has waived the procedural-default defense as to sub-claims 3, 4, and 7-14, as listed above, and those claims are ripe for federal habeas review.

## 2. Merits

Regardless of the procedural posture of Cassano's claims of ineffective assistance of appellate counsel, the Court finds that, like his trial counsel ineffective-assistance claims, all but the final sub-claim, as listed above, are waived for insufficient argumentation. As Respondent argues, "Cassano offers nothing more than conclusory assertions that these claims should have been raised, with no explanation for how these claims meet the *Strickland* standard of review." (Doc. 141 at 102.) Accordingly, because Cassano provides little to no legal or factual argument to support sub-claims 1-13, the Court will not address them.

Cassano does provide argument supporting his tenth claim for relief, alleging appellate counsel should have moved for appointment of counsel to represent him in reopening proceedings and should have advised him concerning the reopening procedures and deadlines so that he could file a *pro se* application. (Doc. 138 at 44-47.) But that claim not a cognizable ground for federal habeas relief.

Where there is no constitutional right to counsel, a petitioner cannot claim constitutionally ineffective assistance of counsel. *Coleman v. Thompson,* 501 U.S. 722, 752 (1991). Generally, "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Id.* (internal citations omitted). The Sixth Circuit has held that because Ohio's reopening process is a separate collateral proceeding from the original appeal, petitioners have no constitutional right to assistance of counsel in such proceedings. *See, e.g., Lopez v. Wilson,* 426 F.3d 339, 352 (6th Cir. 2005). It follows, therefore, that appellate counsel's conduct in connection with a Rule 26(B) application cannot establish ineffective assistance of counsel. *E.g., Williams v. Bagley,* 166 Fed. Appx. 176, 180 (6th

Cir. 2006) (holding that a petitioner "cannot claim ineffective assistance of counsel for his attorney's failure to timely file a 26(B) petition because he had no right to counsel at that stage").

Cassano's ninth and tenth claims for relief, therefore, are denied.

I.      **Eleventh and Thirteenth Claims for Relief:** *Constitutionality of Ohio's Death Penalty Scheme*

In his eleventh and thirteenth claims for relief, Cassano launches a broad attack on the constitutionality of Ohio's capital punishment scheme.  He claims that Ohio's death penalty statutes are constitutionally deficient in the following ways:

1.      prosecutors have unregulated discretion in determining who will be charged with the death penalty;

2.      the statutory scheme fails to require premeditation or deliberation;

3.      the statutory scheme fails to establish a standard for determining the existence of mitigating factors;

4.      the statutory scheme fails to establish a standard by which to balance the mitigating factors against the aggravating circumstances;

5.      the statutory scheme permits the trier of fact to consider aggravating circumstances at the trial phase;

6.      the statutory scheme does not give the sentencer the option to impose a life sentence when the sentencer determines that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt;

7.      the statutory scheme encourages capitally charged individuals to plead guilty, Ohio R. Crim. P. 11(C)(3);

8.      the statutory scheme creates a mandatory death penalty;

9.      the statutory scheme permits the State to argue first and last in mitigation;

10. the statutory scheme permits the death penalty to be applied in an arbitrary, capricious and discriminatory manner;

11. the statutory scheme mandates that the findings of an examination pursuant to Ohio Rev. Code § 2929.03(D)(1) must be furnished to the trial court, the trier of fact, and the prosecutor, and any information learned about the accused would be used against him at trial;

12. the statutory scheme induces ineffective assistance of counsel and denial of an impartial jury;

13. the death specification of which Cassano was convicted, Ohio Rev. Code § 2929.04(A)(4) (offense committed while under detention) fails to satisfy the Eighth Amendment's narrowing requirement;

14. the proportionality review is flawed because of the method Ohio courts use for case comparison;

15. the appropriateness analysis used by Ohio courts does not follow the dictates of Ohio Rev. Code § 2929.05; and

17. the statutory scheme violates international law and Article VI of the United States Constitution.

(Doc. 138 at 47-52, 56-58.)

### 1. Procedural Posture

Respondent concedes that Cassano raised each of these claims in state court on direct review except for sub-claims 13 (regarding the detention specification) and 17 (regarding international law), as listed above, and they therefore are preserved for federal habeas review. (Doc. 141 at 104.)

Sub-claims 13 and 17, Respondent argues, are procedurally defaulted. (*Id*. at 104, 109.) Cassano failed to present the specification sub-claim to any state court, and because it is based on the trial-court record, he no longer can do so. *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that

appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."). Sub-claim 13, therefore, is procedurally defaulted. Moreover, Cassano does not make any showing regarding either the cause for, or prejudice resulting from, his procedural default. Nor does he contend that he is actually innocent such that the default should be excused.

As to Cassano's claim regarding international law, the Ohio Supreme Court found that Cassano waived it because he did not raise it in the trial court. *Cassano*, 96 Ohio St. 3d at 114. The court cited as support for the waiver its decisions in *State v. Awan*, 22 Ohio St. 3d 120, syllabus (Ohio 1986), and *State v. Coley*, 93 Ohio St. 3d 253, 271 (Ohio 2001). In *Awan*, the Ohio Supreme Court held that the "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *Awan*, 22 Ohio St.3d at syllabus. Ohio's high court invoked *Awan*'s waiver rule later in *Coley* to bar the same claim Cassano raises here, challenging Ohio's death penalty scheme under international law. *Coley*, 93 Ohio St. 3d at 271. However, the Ohio Supreme Court also has held that *Awan*'s waiver rule is discretionary. *In re M.D.*, 38 Ohio St. 3d 149, 151 (Ohio 1988). Nevertheless, this Court need not reach the issue of whether *Awan*'s waiver rule constitutes an adequate and independent ground for precluding federal habeas review of this claim, because the claim is meritless. *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily

resolvable against the habeas petitioner").

**2.      Merits**

Cassano presents his claims attacking Ohio's capital punishment scheme in a perfunctory manner, with little or no legal or factual argument.  For that reason, the Court finds them waived.

But even if Cassano had properly preserved and developed the claims, they still would fail.  As the Supreme Court recently observed, "it is settled that capital punishment is constitutional . . . ."  *Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015).  Moreover, the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death penalty scheme in particular, rejecting the very claims Cassano asserts here.  *See, e.g., Beuke v. Houk*, 537 F.3d 618, 652-53 (6th Cir. 2008)*; Buell v. Mitchell*, 274 F.3d 337, 367-76 (6th Cir. 2001)*; Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001)*; Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000); *Jamison v. Collins*, 100 F. Supp. 2d 647, 759-67 (S.D. Ohio 2000)*.*

Cassano's eleventh and thirteenth claims for relief, therefore, are denied.

**J.      Twelfth Claim for Relief:  *Judicial Bias***

Cassano argues in his twelfth claim for relief that he was denied due process because the judge who presided over his trial, Judge James Henson, was biased.  (Doc. 138 at 52-56.)  The judge, he notes, was a member of ManCI's Citizen's Advisory Council and had *ex parte* communications with ManCI employees before and during his trial, which enabled him to obtain "secret," "unverified, [and] inflammatory evidence" that influenced the his decisions, including those regarding courtroom security, Cassano's self-representation request, and sentencing.  (*Id*. at 54.)

Cassano raised this claim in state courts on post-conviction review, where it was considered on the merits. It is therefore preserved for federal habeas review. The last state court to address his judicial-bias claim was the court of appeals, which stated:

{¶ 44} In his third assignment of error, appellant argues that the court erred in dismissing his petition for postconviction relief on the grounds that the judge was not biased and impartial.

{¶ 45} Bias on the part of a judge will not be presumed. *In re Disqualification of Olivito*, 74 Ohio St.3d 1261,1263, 657 N.E.2d 1361. In fact, the law presumes that a judge is unbiased and unprejudiced in the matters over which he presides. *Id*. The appearance of bias or prejudice must be compelling to overcome these presumptions. *Id*.

{¶ 46} Judge James Henson, the judge who presided over appellant's trial and sentenced appellant to death on the jury's recommendation, is on the Citizen's Advisory Counsel at MANCI. Appellant argues that comments made by the judge during the trial concerning his contact with MANCI coupled with minutes of the Advisory Counsel's meetings demonstrate that the judge had ex parte contact which gave him an appearance of being biased and might have exposed him to information about the case which appellant did not have the opportunity to contest or rebut.

{¶ 47} The minutes of the committee meetings reflect comments by Judge Henson about the trial on two separate occasions. In one meeting, which occurred during the trial while the State was presenting its case in chief, Judge Henson thanked the staff of MANCI for their assistance with the trial, and commended staff that had to testify and be present in the courtroom for a job well done. He expressed gratification for how smoothly the trial was conducted. In a second meeting, Judge Henson mentioned that the trial would continue another week or so, that appellant cried during the film showing the murder scene, and there was good security surrounding the trial.

{¶ 48} During trial, the judge commented to counsel when discussing security issues, specifically the shackling of appellant during trial, that he had talked to a former employee at MANCI who told the judge there was a rumor that the Aryan Brotherhood intended to show up at the trial in support of appellant. Tr. 26. When the prosecutor indicated at a conference with the court and defense counsel that the warden at MANCI could not produce a roster of inmates until a later date, the court indicated that he would call to see if the roster could be produced earlier, and further indicated to defense counsel that he would check to see if counsel could get more time at the prison to confer with appellant. Tr.

468. During a discussion with counsel about locking down MANCI for the jury view, the court commented that he goes out there all the time and they don't lock it down for him. Tr. 757. The judge later commented, again to counsel, that he knows how many inmates are at MANCI because he goes out there all the time. Tr. 1038. Prior to the sentencing phase, defense counsel asked if they could get someone from MANCI to talk about classification and sentencing and the court indicated to counsel that he would call and check on this for defense counsel. Tr. 2803.

{¶ 49} While perhaps the court showed poor judgment in commenting on the conduct of the trial at committee meetings while the trial was still going on, nothing in the comments made at the meetings or in the comments made from the bench concerning the judge's contact with MANCI demonstrates that the judge was biased or partial. There is no evidence that the judge had any ex parte information directly bearing on the issue of guilt or sentencing. From the evidence submitted of minutes of the committee meetings and from the citations to the transcript, the judge's contact with MANCI related to security issues surrounding the trial and to aiding counsel for both parties in dealing with the prison.

{¶ 50} Appellant points to nothing in the record that demonstrates bias on the part of the trial judge or possession of ex parte information related to issues of guilt and sentence which affected his right to a fair trial. Appellant generally argues that the judge ultimately imposed the death sentence on him and was perhaps influenced in doing so by his relationship with MANCI. However, the jury initially recommended the death sentence and the Ohio Supreme Court conducted an independent review of the sentence and found the sentence to be appropriate. The Supreme Court noted that appellant's history and background provided little mitigation, and appellant made a choice early in life to live outside the law. *Cassano*, 96 Ohio St.3d 94 at ¶ 127. The court found that appellant made "deliberate choices in his life and must bear the consequences of those choices," and appellant "by his acts has demonstrated that he is a menace to the life, health, and safety of others, even when he is in prison." *Id*. at ¶ 128–129.

{¶ 51} The trial court did not err in finding that appellant had not demonstrated bias or prejudice against appellant or favoritism toward appellee. The third assignment of error is overruled.

*Cassano*, 2013 WL 1858614, at *5-7.

"[T]he floor established by the Due Process Clause clearly requires a fair trial in a

fair tribunal, before a judge with no actual bias against the defendant or interest in the

outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (internal citation and quotation marks omitted). "If a habeas court determines that bias by a state judge resulted in a constitutional violation, then the court is required to overturn the state court decision." *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002).

Nevertheless, a petitioner's burden to prove judicial bias is very high. "[O]nly in the most extreme of cases would disqualification on [the] basis [of bias] and prejudice be constitutionally required . . . ." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986). Courts ordinarily "presume that public officials have properly discharged their duties." *Bracy,* 520 U.S. at 909 (internal quotation marks and citation omitted). Prejudice or bias in this context means "a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . ., or because it is excessive in degree . . . ." *Liteky v. United States*, 510 U.S. 540, 550 (1994) (emphasis original).

Cassano's sole complaint about the state appellate court's decision rejecting this claim is that the state court "focus[ed] solely on the issue of whether there was a conflict," and "ignore[d] the other aspect of this claim – the extra-judicial information the judge received during trial." (Doc. 144 at 29-30.) He claims Judge Henson "received information about the crime that was not formally presented at trial." (*Id*. at 28.) This information was "secret," "unverified, [and] inflammatory," he asserts, and influenced the judge's decisions, including those regarding courtroom security, Cassano's self-representation request, and sentencing. (Doc. 138 at 54.) But the only alleged "extra-judicial" information he identifies is his "institutional disciplinary record and allegations

103

that [he] had an association with the Aryan Brotherhood."  (*Id*.)

Cassano's prison records were not "extra-judicial."  The prosecutor submitted the records to the judge to demonstrate, in his words, that Cassano's "serious criminal record and history of violence . . . justif[ied] [the] trial court['s] security concerns" and the need for shackles.  (Doc. 135-2 at 9-11.)  The judge cited the records in his decision ordering Cassano to wear a stun belt and shackles.  (Doc. 134-4 at 207.)  And the Aryan Brotherhood information was secret.  The state appellate court noted that the judge spoke to counsel on the record about the matter.  (Doc. 135-5 at 26-27.)

Furthermore, as the state court concluded, "the judge's contact with MANCI related to security issues surrounding the trial."  *Cassano*, 2013 WL 1858614, at *6.  This kind of information did not result in a "wrongful or inappropriate" disposition against Cassano, "since [the judge's] knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and [were] . . . necessary to completion of the judge's task" –  namely, maintaining the security of the courtroom and preventing Cassano's escape.  *Liteky*, 510 U.S. at 551.

Indeed, as the state court observed, Cassano has shown "no evidence that the judge had any ex parte information directly bearing on the issue of guilt or sentencing."  *Cassano*, 2013 WL 1858614, at *6.  He offers only vague assertions that the judge had ex parte communications with ManCI staff "about the crime" that influenced the judge to his detriment.  Cassano's claim rests more on the relationship between Judge Henson and the prison, than the exchange of information between the two.  But the fact of this relationship alone does not demonstrate a bias that was wrongful or inappropriate, or so excessive in

degree as to constitute a violation of Cassano's due process rights. *See Aetna Life Ins. Co.*, 475 U.S. at 821 ("Appellant's allegations of bias and prejudice on this general basis . . . are insufficient to establish any constitutional violation.")

Cassano's allegations fail to present a viable claim of constitutionally impermissible judicial bias. And the state appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

### K. Fifteenth Claim for Relief: *Jury Selection*

In his fifteenth claim for relief, Cassano argues the prosecution used peremptory challenges to exclude women from the jury in violation of his equal protection rights. (Doc. 138 at 64.) Respondent contends this claim is procedurally defaulted and meritless. (Doc. 141 at 114-19.)

#### 1. Procedural Posture

Respondent correctly argues this claim is procedurally defaulted. (*Id*. at 114-15.) Cassano first raised it in state court on post-conviction review and the last state court to review it found it barred under Ohio's *res judicata* doctrine. *Cassano*, 2013 WL 1858614, at *8 (¶ 63). The Sixth Circuit consistently has held that the *res judicata* rule is an adequate and independent ground for denying federal habeas relief. *See, e.g., Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000). Moreover, Cassano offers no argument regarding the cause for, or prejudice resulting from, the default, or that

he is actually innocent.[26]

**2.  Merits**

Because no state court addressed this claim, this Court reviews it *de novo*.  *See, e.g.,*

*Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (federal habeas courts may review *de*

*novo* an exhausted federal claim that was not adjudicated on the merits in state court).

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the Equal

Protection Clause prohibits a party from using a peremptory strike to exclude members of

the jury venire on account of their race.  *Id*. at 89.  The Court later extended *Batson* to

forbid the use of peremptory strikes to exclude potential jurors solely on the basis of

gender.  *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994).  "[H]arm from

discriminatory jury selection extends beyond that inflicted on the defendant and the

excluded juror to touch the entire community.  [Such procedures] undermine public

confidence in the fairness of our system of justice."  *Batson,* 476 U.S. at 87.

*Batson's* three-step process for trial courts to evaluate claims that a prosecutor has

used peremptory challenges in a discriminatory manner applies to gender-based claims.

*J.E.B.,* 511 U.S. at 144-45.  First, " a party alleging gender discrimination must make a

prima facie showing of intentional discrimination before the party exercising the challenge

is required to explain the basis for the strike."  *Id*.  Next, "[w]hen an explanation is

required, it need not rise to the level of a "for cause" challenge; rather, it merely must be

based on a juror characteristic other than gender, and the proffered explanation may not be

---

[26] Respondent also asserts that this claim, first asserted in Cassano's amended petition, is untimely.  (Doc. 144 at 113.)  Because the Court finds the claim barred from review on procedural-default grounds, it declines to address the statute-of-limitations issue.

pretextual." *Id*. Third, the trial court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98.

Here, Cassano argues that the prosecution improperly used four peremptory challenges to exclude potential jurors, all of which were directed at women, and one peremptory strike to eliminate a woman from the prospective alternate jurors. (Doc. 138 at 64 (citing Doc. 135-13 at 11-17).) He claims, with no legal or further factual analysis, that "[t]he record establishes a prima facie case that the State was engaged in a discriminatory process to select the jury." (*Id*. at 64.)

Respondent counters that Cassano did not object to any of these peremptory strikes at trial, "so there was no prima facie showing of intentional discrimination" to satisfy *Batson*'s first step. (Doc. 141 at 115.) Indeed, the Sixth Circuit has held that a *Batson* challenge must be raised "contemporaneously with the voir dire process or prior to the time that the venire is dismissed," or it is waived. *United States v. Reid*, 764 F.3d 528, 533 (6th Cir. 2014) (citing *McCrory v. Henderson,* 82 F.3d 1243, 1247 (2d Cir. 1996) ("The Court's discussion in *Batson*, however, makes clear that it envisioned an objection raised during the jury selection process."); *see also Thomas v. Hudson*, No. 1:07 CV 1430, 2008 WL 2902063, at *2 (N.D. Ohio July 23, 2008) (Economus, J.) (denying habeas *Batson* claim where "any examination of the merits of the *Batson* claim was more than was required because no timely objection was actually made by defense counsel, which waived such a claim on appeal for all except plain error."). Because Cassano did not timely object to the alleged *Batson* violation at trial, he has waived his right to assert the claim here.

The Court finds, therefore, that Cassano's fifteenth claim for relief is procedurally

defaulted and without merit.

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Cassano's claims for relief. The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right. *Slack v. McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision

108

between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief: 2 (presence); 4 (public trial); 6 (ineffective assistance of trial counsel), sub-claims 11 and 12; 9 and 10 (ineffective assistance of appellate counsel), sub-claims 3, 4, 7-12; and 11 and 13 (Ohio's death penalty scheme). No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for claims for relief: 6 (ineffective assistance of trial counsel), sub-claims 2, 4-10; 9 (ineffective assistance of appellate counsel), sub-claims 1, 2, 5, and 6; 11 (Ohio's death penalty scheme), sub-claim 13; and 15 (juror selection) because they are unequivocally procedurally defaulted.

In addition, no COA will issue for claims for relief: 5 ("other acts" evidence); 7 and 14 (Ohio's post-conviction relief scheme); and 8 (ineffective assistance of state post-conviction counsel) because they are not cognizable on federal habeas review.

The Court will issue a COA for Cassano's claims for relief: 1 (self-representation);

3 (restraints); 6 (ineffective assistance of trial counsel), sub-claims 1 (judge's recusal) and 3 (mitigating evidence); and 12 (judicial bias).  A reasonable jurist could debate the Court's conclusions regarding these claims.

CONCLUSION

For the foregoing reasons, this Court denies Cassano's Amended Petition for Writ of Habeas Corpus (Doc. 138).  The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to Cassano's first, third, sixth (sub-claims 1 and 3), and twelfth claims for relief, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only.  As to all remaining claims, the Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

The Court also denies Cassano's requests for discovery.

IT IS SO ORDERED.


  July 18, 2018              /s/ John R. Adams
Date                         John R. Adams
                             United States District Judge